*In re Petition for Emergency Remedy by the Maryland State Board of Elections*, No. 21, September Term, 2022.

**CONSTITUTIONAL LAW – SEPARATION OF POWERS – JUDICIAL FUNCTION**

Section 8-103(b)(1) of the Election Law Article provides that in emergency circumstances falling short of a declared state of emergency that interfere with the electoral process, a circuit court that is petitioned by a board of elections may "take any action the court considers necessary to provide a remedy that is in the public interest and protects the integrity of the electoral process." Section 8-103(b)(1) does not violate the separation of powers guaranteed by Article 8 of the Maryland Declaration of Rights because the task delegated to the court by the statute constitutes a judicial function. The Court based that conclusion on consideration of two factors it has traditionally used to determine whether a task is a judicial function: (1) whether the task is of a nature that has traditionally been delegated to the judicial branch; and (2) whether the legislative body has provided sufficient guidance limiting the court's discretion so that the court is not called upon to make a decision based on policy, expediency, or politics.

**STATUTORY INTERPRETATION – DEFINITION OF EMERGENCY CIRCUMSTANCES IN ELECTION LAW ARTICLE § 8-103(b)(1)**

The Circuit Court for Montgomery County did not err in its determination that the combination of the anticipated volume of absentee ballots in the November 2022 general election and the limited capacity of the local boards of election to timely canvass those ballots constituted "emergency circumstances" that "interfere with the electoral process" for purposes of § 8-103(b)(1) of the Election Law Article.

Circuit Court for Montgomery County
Case No. C-15-CV-22-003258
Argued: October 7, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 21

September Term, 2022

_____

IN RE PETITION FOR EMERGENCY
REMEDY BY THE MARYLAND STATE
BOARD OF ELECTIONS

_____

Fader, C.J.,
Watts,
Hotten,
Booth,
Biran,
Eaves,
Adkins, Sally, D. (Senior Justice,
Specially Assigned),

JJ.
_____

Opinion by Fader, C.J.
Biran, J., concurs
_____

Filed: March 29, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

This appeal presents a challenge to an order of the Circuit Court for Montgomery County that permitted local boards of election to begin "canvassing" absentee ballots more than a month before the November 2022 general election. Canvassing ballots includes "the entire process of vote tallying, vote tabulation, and vote verification or audit, culminating in the production and certification of the official election results." Md. Code Ann., Elec. Law § 11-101(c)(1) (2022 Repl.). Under current Maryland law, although voters can submit absentee ballots weeks before election day, local boards of election are prohibited from opening them, and thus beginning the canvassing process, until after election day. *Id.* § 11-302(b)(1).

In connection with the November 8, 2022 general election, the State Board of Elections (the "State Board"), filed a petition asking the circuit court to authorize local boards of election to begin canvassing absentee ballots on October 1, 2022. The State Board sought that authority under § 8-103(b)(1) of the Election Law Article, which provides that "[i]f emergency circumstances, not constituting a declared state of emergency, interfere with the electoral process, the State Board . . . may petition a circuit court to take any action the court considers necessary to provide a remedy that is in the public interest and protects the integrity of the electoral process." According to the State Board, emergency circumstances existed because of the State's combined experience with absentee ballots during the 2020 primary and general elections and the 2022 primary election, as well as historical trend data. Those experiences and data led the State Board to conclude that the volume of absentee ballots it was likely to receive during the 2022 general election could not be processed timely if local boards could not start canvassing

the ballots until after the election. The State Board further alleged that the ensuing delay would render the State incapable of complying with statutory requirements related to the certification of election results and would undermine the integrity of the electoral process.

Daniel Cox, a candidate for governor in the November 8, 2022 general election and then-member of the Maryland House of Delegates, intervened and opposed the State Board's petition. Candidate Cox opposed the petition on two bases: (1) § 8-103(b)(1) violates the separation of powers guaranteed by Article 8 of the Maryland Declaration of Rights by delegating to the courts the nonjudicial function of regulating the timing of elections; and (2) the problems forecasted by the State Board did not constitute "emergency circumstances" because they were foreseeable.

The circuit court held that § 8-103(b)(1) is constitutional, determined that the State Board had proven the existence of emergency circumstances, and permitted the State Board to begin canvassing absentee ballots on October 1, 2022.

After Candidate Cox appealed to the Appellate Court of Maryland (then named the Court of Special Appeals),[1] the State Board sought certiorari review in this Court, which we granted. *In re Petition for Emergency Remedy*, 482 Md. 7 (2022). In a per curiam order issued after oral argument, we affirmed. *In re Petition for Emergency Remedy*, 482 Md. 12 (2022) (per curiam). We now explain the basis for our order.

---

[1] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

2

## BACKGROUND

### A. *Statutory and Regulatory Scheme*

### 1. *Absentee Ballots Generally*

There are three ways to vote in Maryland: (1) in-person on election day, Elec. Law § 10-301; (2) in-person during the early voting period, *id.* § 10-301.1; and (3) by absentee ballot, *id.* §§ 9-301 – 9-312. Our focus here is on voting by absentee ballot.[2] Absentee voting was first introduced in Maryland in the State's 1864 constitution, to permit Union soldiers to vote. Dan Friedman, *The Maryland State Constitution* 86-87 (G. Alan Tarr ed., 2011). Provision for absentee voting was left out of the 1867 Constitution initially but was added in by amendment in 1918, limited at that time only to "qualified voters serving in the 'Military or Naval Service of the United States.'" *Id.* at 87. Further constitutional amendments permitted the General Assembly to extend the right: (1) in 1954, to "anyone who was physically absent from the state at the time of an election," *id.*; (2) in 1956, to "disabled voters," *id.*; and (3) in 1974, to any "qualified voters who are unable to vote

---

[2] In 2020, the General Assembly adopted § 9-301(c) of the Election Law Article, which requires the State Board and local boards of election to "refer to absentee ballots as 'mail-in ballots' and absentee voting as 'mail-in voting' in all communications with voters and the general public." 2020 Md. Laws chs. 36 & 37; Elec. Law § 9-301(c)(1). That change was intended to "bring clarity to the absentee voting process" considering the expansion of absentee voting to any qualified voters. *Election Law – References to Absentee Voting in Communications – Mail-In Voting: Hearing on S.B. 145 Before the Educ., Health & Env't Affs. Comm.*, 2020 Leg., 441st Sess. (statement of Sen. Hester, Member, Educ., Health & Env't Affs. Comm.). Such communications are also required to include a statement acknowledging that "mail-in voting" is still "referred to as absentee voting in the Maryland Constitution, the Annotated Code of Maryland, and the Code of Maryland Regulations." Elec. Law § 9-301(c)(2). In this opinion, we will follow those sources of law in continuing to refer to "absentee voting" and "absentee ballots."

personally," Md. Const. Art. I, § 3 (1974).[3]  Finally, in 2008, the General Assembly was

given the power to extend the right to any "qualified voters who might otherwise choose

to vote by absentee ballot."[4]  2007 Md. Laws ch. 513.

As amended, Article I, § 3(a) authorizes the General Assembly:

> to provide by suitable enactment for voting by qualified voters of the State of Maryland who are absent at the time of any election in which they are entitled to vote, for voting by other qualified voters who are unable to vote personally, or for voting by qualified voters who might otherwise choose to vote by absentee ballot, and for the manner in which and the time and place at which such voters may vote, and for the canvass and return of their votes.

The General Assembly has carried out that power by adopting Election Law

§§ 9-301 – 9-312, which govern absentee voting generally, and Election Law § 11-302,

which governs the canvassing of absentee ballots.

### 2. Absentee Ballots Canvassing

A registered voter who wishes to cast an absentee ballot must request one, which

can be done by mail or online until the week before the election, or in person as late as

election day.  *Id.* § 9-305.  As of June 2021, voters may also request to be placed on a

"permanent absentee ballot list."  *Id.* § 9-311.1.  Once a local board validates a voter's

---

[3] Consistent with the constitutional limitations, until 2006, a voter's ability to cast an absentee ballot was also limited by statute to circumstances in which the voter was either absent from the jurisdiction on election day or unable to go to the polls for an identified reason.  *See* Elec. Law § 9-304 (2003).  In 2006, the General Assembly amended § 9-304 to eliminate those limitations and provide that "[a]n individual may vote by absentee ballot except to the extent preempted under an applicable federal law."  2006 Md. Laws ch. 6; *see also* Elec. Law § 9-304 (Repl. 2022).

[4] The same 2008 constitutional amendment that extended the General Assembly's power to authorize absentee voting to any qualified voters also permitted the General Assembly to authorize early voting.  *See* 2007 Md. Laws ch. 513.

eligibility to vote absentee and ballots are available, the local board must provide the voter an absentee ballot as soon as practicable. *Id.* §§ 9-306, 9-309.

Although absentee ballots may be returned at any time after they are received, § 11-302(b)(1) prohibits a local board of elections from opening an absentee ballot envelope "prior to 8 a.m. on the Wednesday following election day." Once canvassing begins, the local boards are required to "release a report of the unofficial results of the absentee ballot vote tabulation" each day. *Id.* § 11-302(e). To be counted, an absentee ballot must be (a) received by a local board, dropped off at a polling place, or deposited into a ballot drop box before the polls close on election day, or (b) sent by the United States Postal Service on or before election day and received no later than "10 a.m. on the second Friday after an election." Md. Code Regs. ("COMAR") 33.11.03.08B (2022); *see* Elec. Law § 11-302(c).

The time-consuming process of canvassing absentee ballots is spelled out in detail by regulation. That process must "[b]e conducted separately from the review, inspection, and tabulation of polling place ballots," but still "in the same manner as for polling place ballots, insofar as those procedures are appropriate." COMAR 33.11.04.01A(2), (3). Each local board, acting "in its role as a board of canvassers," is responsible for canvassing absentee ballots from its jurisdiction. *Id.* 33.11.04.02 (2022). The election director begins by sending batches of "a controllable number of ballots" to each "team" of reviewers. *Id.* 33.11.04.05A. For each ballot, the assigned team is charged with (1) verifying the timeliness of the ballot and that the oath is signed and the envelope is sealed, (2) opening each envelope by a "means that will not damage the contents," and then (3) placing "the

5

envelope with the mailing address face down on the table without removing the contents." *Id.* 33.11.04.05B–D. The team then removes the contents "one at a time, taking care that each envelope remains face down." *Id.* 33.11.04.05E. The team must separate any voter assistance certificates into separate stacks and verify that no more than one ballot is in any envelope, before setting the envelopes aside. *Id.* 33.11.04.05G–H. The team then inspects "each ballot for compliance and tabulating acceptability." *Id.* 33.11.04.07A. Any issues that arise while opening the envelopes or during initial review or ballot inspection are referred to the local board to decide whether to reject or accept the ballot. *Id.* 33.11.04.06, .08.

Once a team has completed a batch, the election director must file the return envelopes, place "the ballots in appropriate groups for tabulation," and give the team a new batch for processing. *Id.* 33.11.04.07D. The local board is required to group ballots according to whether they are (1) acceptable for tabulation, (2) acceptable to the board but objected to by a contesting party, or (3) rejected by the board.[5] *Id.* 33.11.04.09A. The votes from the ballots in each of the first two groups are tabulated separately and then reported and included in the unofficial vote totals. *Id.* 33.11.04.09B. Once removed from their envelopes, ballots must be tabulated "without unreasonable delay." *Id.* 33.11.04.10.

### 3. Post-Election Deadlines

Section 11-308(a) of the Election Law Article requires that "[w]ithin 10 days after any election, and before certifying the results of the election, each board of canvassers shall

---

[5] The regulations contain extensive provisions relating to grounds for rejection of absentee ballots. COMAR 33.11.05.01 – .08.

6

verify the vote count in accordance with the regulations prescribed by the State Board for the voting system used in that election." Once the required verification process is completed, each local board of canvassers must certify the accuracy of the results, and that they have been verified, to the Governor, the State Board, and the clerk of the local circuit court. *Id.* §§ 11-308(b), 11-401. The transmittal of the certification is to "be made on the second Friday after a primary or general election or, if the canvass is completed after that date, within 48 hours after the completion of the canvass." *Id.* § 11-401(c)(1). Circuit court clerks are required to record the certified local election results. *Id.* § 11-401(d).

Based on the expected timing of the certification, several Maryland counties have set the terms of their respective offices to begin on the first Monday in December. *See, e.g.*, Montgomery County Code, Part I, art. I, § 105 & art. II, § 202 (providing that terms of office for members of the Montgomery County Council and County Executive begin on the first Monday in December); Charter for Prince George's County, art. III, § 306 & art. IV, § 404 (providing the same for members of the Prince George's County Council and County Executive); Charter of Baltimore County, art. II, § 203 & art. IV, § 402(a) (providing the same for members of the Baltimore County Council and County Executive); Charter of Frederick County, Maryland, art. II, § 206(a) & art. IV, § 404(a) (providing the same for members of the Frederick County Council and County Executive).

The Board of State Canvassers is required to convene to certify the results of the statewide election within 35 days of the election, Elec. Law §§ 11-502(a) & 11-503(a), and the certification triggers a three-day deadline to file a petition for a recount, *id.* § 12-101(d).

Finally, the United States Congress is required to "assemble . . . at noon on the 3d day of January."  U.S. Const. amend. XX, § 2.

### 4.  *Emergencies*

Subtitle 1 of Title 8 of the Election Law Article contains three sections addressed generally to all Maryland elections.  The first two, §§ 8-101 and 8-102, generally charge local boards with conducting elections, charge the State Board with supervising elections, require uniformity in elections, and establish requirements for providing notice of relevant information to registered voters.

Section 8-103 addresses two types of emergencies.  First, pursuant to § 8-103(a), if the Governor declares a state of emergency "that interferes with the electoral process, the emergency proclamation may" postpone the election or specify alternate voting locations or systems.

Second:

> If emergency circumstances, not constituting a declared state of emergency, interfere with the electoral process, the State Board or a local board, after conferring with the State Board, may petition a circuit court to take any action the court considers necessary to provide a remedy that is in the public interest and protects the integrity of the electoral process.

Elec. Law § 8-103(b)(1).  This is the provision at the center of the present dispute.

### 5.  *Recent Legislative Activity*

Three developments in the last two legislative sessions are relevant to our discussion below.  First, during the 2021 legislative session, the General Assembly enacted two changes to make absentee balloting more accessible:  (1) providing for the placement of

8

secure drop boxes to collect absentee ballots; and (2) creating a permanent absentee ballot list.  2021 Md. Laws, ch. 56; *see also* Elec. Law §§ 2-304, 2-305, 9-311.1.

Second, during the 2022 legislative session, the General Assembly passed two companion bills that would have amended § 11-302(b)(1) of the Election Law Article to, among other things:  (1) permit local boards to begin canvassing absentee ballots eight days before the first day of early voting;[6] but (2) preclude local boards from tabulating absentee ballots before the polls close on election day.  S.B. 163, 2022 Leg., 444th Sess. (Md. 2022) § 1; H.B. 862, 2022 Leg., 444th Sess. (Md. 2022) § 1.[7]  Governor Lawrence J. Hogan, Jr. vetoed the bills.  In a letter explaining his vetoes, Governor Hogan lauded the change that would have permitted earlier processing of absentee ballots, saying it "would allow hard working election officials to get a much needed head start on the deluge of ballot envelopes that, under current law, must wait until after Election Day for processing."  His vetoes, he stated, were addressed not to that portion of the bills but to the legislation's failure to add "basic security measures such as signature verification" and protections against "ballot collecting."

---

[6] Early voting centers are open from "the second Thursday before a primary or general election through the Thursday before the election."  Elec. Law § 10-301.1(d)(1). For the 2022 general election, the second Thursday before election day was October 27, 2022, and eight days before that was Wednesday, October 19, 2022.

[7] The legislation contained an uncodified provision that would have permitted tabulation of absentee vote totals before the polls closed only during the 2022 statewide primary election.  *See* S.B. 163, § 2; H.B. 862, § 2.

### B. Absentee Ballots in the 2020 Primary and General Elections and the 2022 Primary Election

Both the 2020 primary and general elections were held during a declared state of emergency due to the COVID-19 pandemic. As relevant here, that had two chief consequences for those elections. First, absentee voting was strongly encouraged, and voters made significantly greater use of it than ever before. Pursuant to a series of emergency executive orders issued by Governor Hogan, the 2020 elections were conducted principally by absentee ballot. In the June 2020 primary election, 97% of votes were cast by absentee ballot. In the November 2020 general election, 1,528,327 ballots, 51.7% of total non-provisional ballots,[8] were cast by absentee ballot. *See 2020 Presidential General Election: Total Voter Turnout*, State Bd. Elections, https://perma.cc/V7B6-GJZX (last visited Mar. 20, 2023). By comparison, absentee ballots comprised 6.5% of total ballots cast in the 2016 presidential general election[9] and 5.3% of the total ballots cast in the 2018 gubernatorial general election, which was the highest of the three most recent gubernatorial general elections before 2022.[10]

Second, using authority granted pursuant to the state of emergency, the State Board suspended the application of § 11-302(b)(1) of the Election Law Article for the 2020

---

[8] Consistent with the way the State Board has identified percentages, provisional ballots are not included in any of the ballot totals identified in this opinion.

[9] *Official Turnout (By Party and County), Election: 2016 Presidential General Election*, State Bd. Elections, https://perma.cc/UL3S-CT4F (last visited Mar. 20, 2023).

[10] *Official Turnout (By Party and County), Election: 2018 Gubernatorial General Election*, State Bd. Elections, https://perma.cc/U4FZ-2H5C (last visited Mar. 20, 2023).

general election. The State Board permitted each local board to begin processing absentee ballots on October 1, 2020.

Governor Hogan announced the end of the COVID-19 state of emergency in June of 2021. Exec. Order No. 21-06-15-01 (terminating various emergency orders). The July 19, 2022 gubernatorial primary was thus the first election to occur outside of a declared state of emergency in nearly four years. In the primary, 346,113 absentee ballots were cast, comprising 34.8% of all ballots.[11] Although much lower than during the 2020 presidential primary, those numbers were an order of magnitude greater than the highest total from the three previous gubernatorial primary elections, which was 30,122 absentee ballots cast, comprising 3.5% of the total, in the 2018 primary.[12]

The increase over the 2018 primary was particularly stark in some of the State's larger jurisdictions, including Prince George's County (1,138% increase); Montgomery County (606% increase); Baltimore County (1,330% increase); Baltimore City (1,205% increase); Anne Arundel County (1,538% increase); Howard County (1,737% increase); and Frederick County (1,671% increase).

With § 11-302(b)(1) of the Election Law Article no longer suspended by executive order, local boards were required to wait until after election day to open absentee ballots. As we discuss further below, that led to delays in reporting results in some jurisdictions.

---

[11] *Official Turnout (By Party and County), Election: 2022 Gubernatorial Primary Election*, State Bd. Elections, https://perma.cc/4KTJ-MMGH (last visited Mar. 20, 2023).

[12] *Official Turnout (By Party and County), Election: 2018 Gubernatorial Primary Election*, State Bd. Elections, https://perma.cc/R3V3-TGUK (last visited Mar. 20, 2023).

Those delays ultimately caused Maryland to miss some statutory deadlines related to finalizing the general election ballot.[13]

### C.   *Procedural Background*

On September 2, 2022, the State Board filed in the Circuit Court for Montgomery County what it styled a "Petition for Emergency Remedy to Permit Early Canvassing and Tabulation of Mail-In Ballots for the 2022 Gubernatorial General Election." In the petition, the State Board included factual allegations concerning the relatively sparse use of absentee ballots before the 2020 election cycle, the significant use of them during the 2020 election cycle, and their continued substantial use in the 2022 primary election. According to the State Board, the 2022 primary had served "as a stress test of the State's new electoral paradigm," and the results showed that the system was not up to the challenge unless local boards could start canvassing absentee ballots before the upcoming election.

The State Board focused on three points in making its case that an order allowing local boards to begin canvassing absentee ballots before the election day for the 2022 general election was necessary to preserve the integrity of the electoral process. First, it explained why it expected to be inundated with large numbers of absentee ballots in the 2022 general election, including: (1) the State's experience with the 2022 primary election demonstrated that increased use of absentee ballots was not exclusively a pandemic

---

[13] The deadlines missed after the 2022 primary election, none of which are relevant to a general election, are established to enable the State Board to comply with the requirement to timely "certify and publicly display" the general election ballot. *See* Elec. Law § 9-207(a)(2). They include deadlines for primary winners to decline a nomination, *id.* § 5-801(b)(2)(i), and for appropriate political bodies to fill any vacated nominations, *id.* §§ 5-1002 – 1004.

phenomenon; (2) the General Assembly had recently made it easier to vote absentee; and (3) based on trends from the last three gubernatorial election cycles, in which three-to-four times as many absentee ballots were cast in general elections as in the primaries, "one could reasonably anticipate that local boards of election will receive between *1,000,000 and 1,300,000 mail-in ballots* during the upcoming general election."

Second, the State Board explained that it would take an extended period for local boards to count the anticipated volume of absentee ballots. In addition to setting forth the elaborate, time-consuming, largely manual requirements for canvassing absentee ballots discussed above, the State Board presented affidavits from representatives of five local boards, which explained in differing levels of detail the difficulties they expected to encounter if unable to begin canvassing absentee ballots early. For example, the Acting Election Director of the Montgomery County Board of Elections averred that: (1) in spite of the return to full availability of in-person voting for the 2022 primary, Montgomery County still received seven times more absentee ballots than in 2018; (2) Montgomery County already had 72,774 voters on its permanent absentee ballot list, including nearly 11,000 for receipt of web delivery ballots, which are even more time-intensive to process than paper delivery absentee ballots; (3) during the primary absentee ballot canvass, Montgomery County was able to process approximately 10,000 regular absentee ballots per day and approximately 3,000 web delivery ballots per day; (4) based on the number of absentee ballots received in the 2022 primary election, the local board was forecasting approximately 150,000 absentee ballots in the general election; (5) the local board expected to "need three weeks or more of continuous canvassing . . . just to complete the canvass

13

part of the election process"; and (6) the local board did not have the capacity to "simply hire additional staff to process ballots more quickly," due to a lack of physical space, an inability to begin the process of allowing a voter to cure deficient web delivery ballots until ballots are opened, the limited number of permanent board staff available to supervise canvassing, and budget limitations, among other reasons.

Third, the State Board identified election-related dates and deadlines it would be in jeopardy of missing if it had to wait to begin the canvass until after election day, including those identified above in Part A.3.

In its petition, the State Board requested that the circuit court issue an order: (1) suspending the application of § 11-302(a), (b)(1), and (e) for the 2022 general election;[14] (2) allowing local boards of canvassers to meet to canvass absentee ballots (including tabulating those ballots) no earlier than 8:00 a.m. on October 1, 2022; and (3) permitting local boards of elections to release an unofficial report of absentee ballot tabulations no earlier than when polls close on election day and, after that, at the end of each canvassing day.

Candidate Cox moved to intervene as a party defendant, which the circuit court granted. Although Candidate Cox stipulated to the accuracy of the facts alleged in the

---

[14] In this opinion, we focus on Election Law § 11-302(b)(1), which contains the prohibition on canvassing absentee ballots until the day following election day. The other provisions the State Board asked the court to suspend are: (1) § 11-302(a), which requires that each local board of elections meet to canvass absentee ballots "[f]ollowing an election"; and (2) § 11-302(e), which requires each local board, "[a]t the end of each day of canvassing," to "prepare and release a report of the unofficial results of the absentee ballot vote tabulation." The first is complementary to § 11-302(b)(1) and the second had to be suspended to prevent release of voting results before election day.

14

petition, he argued that the relief requested was nonetheless unavailable, because (1) Election Law § 8-103(b)(1) is unconstitutional and (2) the factual circumstances identified by the State Board did not constitute emergency circumstances because they were entirely foreseeable and, indeed, foreseen.

After a hearing, the court held that § 8-103(b)(1) did not violate the separation of powers required by Article 8 of the Maryland Declaration of Rights and that the facts presented by the State Board and stipulated to by Candidate Cox constituted emergency circumstances. The circuit court granted the State Board's petition and entered an order providing the remedy it had requested.

Candidate Cox noted an appeal. Before briefing in the Appellate Court, the State Board filed a petition for a writ of certiorari and a request for expedited review with this Court, both of which we granted. *In re Petition for Emergency Remedy*, 482 Md. 7 (2022). On October 7, 2022, following oral argument, we issued an order affirming the circuit court in all respects. *In re Petition for Emergency Remedy*, 482 Md. 12 (2022) (per curiam). We now explain the basis for that order.

## DISCUSSION

### *Standard of Review*

We review the circuit court's legal conclusions, including its construction of § 8-103(b)(1) and its determination of constitutionality, without deference. *See* Md. Rule 8-131(c); *see also Mayor & City Council of Ocean City v. Comm'rs of Worcester County*, 475 Md. 306, 311-12 (2021) ("Our interpretation of the Maryland Constitution is a question of law; therefore, we review a circuit court's interpretation of the Maryland Constitution

15

under a *de novo* standard."); *Wheeling v. Selene Fin. LP*, 473 Md. 356, 373 (2021) ("Where questions of law and statutory interpretation are presented, this Court reviews them *de novo*[.]"). Because Candidate Cox stipulated to the facts presented by the State Board, there are no disputed factual findings for us to review. However, the circuit court's determination of whether the stipulated facts rise to the level of emergency circumstances is a mixed question of law and fact, which is entitled to "deferential review" by this Court. *See, e.g.*, *Liddy v. Lamone*, 398 Md. 233, 247 (2007); *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492, 504-05 (2014).

When evaluating the constitutionality of a statute, "[w]e begin with a presumption that the statute is constitutional." *Mahai v. State*, 474 Md. 648, 661 (2021) (quoting *Walker v. State*, 432 Md. 587, 626 (2013)). To overcome that presumption, the party challenging the statute must demonstrate "a clear and unequivocal breach of the Constitution, not a doubtful and argumentative implication." *Mahai*, 474 Md. at 662 (quoting *Anderson v. Baker*, 23 Md. 531, 628 (1865)).

## I.

Candidate Cox contends that § 8-103(b)(1) of the Election Law Article violates the separation of powers guaranteed by Article 8 of the Maryland Declaration of Rights because it impermissibly delegates to the courts the nonjudicial function of regulating the timing and manner of elections. The State Board contends that § 8-103(b)(1) does not offend Article 8 because adjusting the timeline of an election is a judicial function. We agree with the State that § 8-103(b)(1) is constitutional, although our reasoning is a bit different.

16

## A. The General Assembly Can Delegate Only Judicial Functions to the Judiciary.

The Constitution of Maryland, unlike the United States Constitution, contains an express guarantee of the separation of powers among the respective branches of government. Article 8 of the Declaration of Rights provides:

> That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other.

More than 170 years ago, this Court explained that "[t]he evident purpose of the declaration [of separation of powers] is to parcel out and separate the powers of government[.]" *Sugarloaf Citizens Ass'n, Inc. v. Gudis*, 319 Md. 558, 569 (1990) (quoting *Wright v. Wright's Lessee*, 2 Md. 429, 452-53 (1852)). Doing so preserves to each branch of government its essential functions, protected from encroachment by either of the others, so that each may serve as a check and balance on the power of the others. *McCulloch v. Glendening*, 347 Md. 272, 283-84 (1997). The separation of powers thus serves as a fundamental building block of our constitutional structure that is critical to protecting against too great an aggregation of power in any one branch. *See, e.g.*, *Dep't of Transp. v. Armacost*, 311 Md. 64, 77-78 (1987) ("Steeped in the political theories of Montesquieu and Locke, those who framed the constitutions of our states and of the federal government believed that separating the functions of government and assigning the execution of those functions to different branches was fundamental to good government and the preservation of civil liberties."); *Att'y Gen. v. Waldron*, 289 Md. 683, 688 (1981) (identifying the purpose of the separation of powers doctrine as "not to avoid friction, but, by means of the

17

inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy" (quoting *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting))); *Robey v. Prince George's County,* 92 Md. 150, 161 (1900) (stating that permitting the same officers to exercise the functions of multiple branches of government "would be a menace to civil liberty").

Although fundamental, the doctrine of separation of powers is not rigid and does not adhere to "clear lines of demarcation." *McCulloch*, 347 Md. at 283 (internal quotation marks omitted). The three branches are thus not "wholly separate and unmixed[.]" *Murphy v. Liberty Mut. Ins. Co.*, 478 Md. 333, 370 (2022) (quoting *Crane v. Meginnis,* 1 G. & J. 463, 476 (1829)); *see also McCulloch*, 347 Md. at 284 ("[T]he separation of powers doctrine does not require absolute separation between the branches of government."). Recognizing that the functions of each branch of government must necessarily overlap to some degree, we have stated that the doctrine should be applied with a "sensible degree of elasticity," and not "with doctrinaire rigor." *Dep't of Nat. Res. v. Linchester Sand & Gravel Corp.*, 274 Md. 211, 220 (1975); *see also Murphy*, 478 Md. at 371. Nevertheless, "this constitutional 'elasticity' cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power[.]" *Linchester*, 274 Md. at 220. Thus, no branch of government may intrude on the core functions of either of the others. *Waldron*, 289 Md. at 688-89.

One way in which we have consistently maintained separation of the Judiciary from the core functions of the other branches is by "repeatedly [holding] that 'Article 8 prohibits the courts from performing nonjudicial functions.'" *Sugarloaf*, 319 Md. at 569 (quoting

18

*Reyes v. Prince George's County*, 281 Md 279, 295 (1977)); *see also, e.g., Duffy v. Conaway*, 295 Md. 242, 254 (1983) ("[A] court has no jurisdiction to perform a nonjudicial function, and any enactment which attempts to confer such a function on a court is unconstitutional."); *Cromwell v. Jackson,* 188 Md. 8, 28 (1947) ("[W]hen this Court is of opinion that the Legislature has exceeded its authority in placing a non-judicial function on the Court, we should not hesitate in declaring the Act void."); *Prince George's County Comm'rs v. Mitchell,* 97 Md. 330, 340 (1903) (holding unconstitutional a statute that indirectly required "[j]udges to discharge non-judicial functions"); *Bd. of Supervisors of Election for Wicomico County v. Todd*, 97 Md. 247, 263-64 (1903) (stating that "[c]ourts and [j]udges provided for in our system shall, not only, not be required but shall not be permitted to exercise any power or to perform any trust or to assume any duty not pertaining to or connected with the administering of the judicial function"); *Beasley v. Ridout*, 94 Md. 641, 659 (1902) (stating that "[j]udges cannot be compelled to perform services not of a judicial nature"); *Baltimore City v. Bonaparte*, 93 Md. 156, 162 (1901) (holding that the "Legislature had no authority to impose" a nonjudicial function on judges). Thus, even when the General Assembly expressly delegates a task to the Judiciary, as it has done in § 8-103(b)(1), the delegation complies with Article 8 only if the task to be performed constitutes a judicial function.[15]

---

[15] In discussing separation of powers vis-à-vis judicial action in *Murphy v. Liberty Mutual Insurance Co.*, this Court identified "four broad categories" of cases in which we have "addressed the Judiciary's place in Maryland's system of government":

> (1) those involving a legislative attempt to assign to the courts a task that had nothing to do with adjudicating cases . . . ; (2) those involving actions taken

In considering whether a particular task is a judicial function, our focus is on the act, not the person performing it. *See Schisler v. State*, 394 Md. 519, 573-74 (2006) (stating that the "character" of a function "is dependent on its qualities, not on the mere accident as to the person who has been designated to do it" (quoting *Robey*, 92 Md. at 161-62)). Recognizing that there is no "precise definition" of judicial function that can be applied in every case, *Sugarloaf*, 319 Md. at 570, our caselaw reflects two factors we have used to determine whether a task is a judicial function:  (1) whether the task is of a nature that has traditionally been performed by the judicial branch, *see, e.g.*, *Sugarloaf*, 319 Md. at 570; *Linchester*, 274 Md. at 226; *Todd*, 97 Md. at 252; and (2) whether the legislative body has provided sufficient guidance limiting the court's discretion so that the court is not called upon to make a decision based on policy, expediency, or politics, *see, e.g.*, *Sugarloaf*, 319 Md. at 568-70, 572 (1990); *Cromwell*, 188 Md. at 24-28; *Talbot County v. Miles Point Prop., LLC*, 415 Md. 372, 391-92 (2010); *Schisler*, 394 Md. at 574.

First, we have considered whether the delegated task requires a court to:  (1) act in a manner that is inconsistent with the "standards or rules normally applied by courts in the

---

by, or requested of, a particular court in a particular proceeding that encroached upon a legislative or executive function; (3) those that concern whether the adoption of a particular rule by the Court of Appeals exceeded the Court's authority under Article IV, § 18(a) to adopt rules and regulations concerning "the practice and procedure" in the courts; and (4) those involving whether a particular rule or other action by the Judiciary exceeded the rulemaking authority of the Court of Appeals under that same section concerning "the administration" of the courts.

478 Md. at 373-74 (footnotes omitted).  Here, we are concerned with the first category, involving express legislative delegation.

20

exercise of their usual judicial functions," *Sugarloaf*, 319 Md. at 570 (quoting *Beasley*, 94

Md. at 658-59); or (2) exercise powers "not within the 'ordinary or recognized powers'"

of a court, *Sugarloaf*, 319 Md. at 570 (quoting *Close v. Southern Md. Agr. Assoc.*, 134 Md.

629, 642 (1919)). In *Linchester*, we collected examples of delegated tasks we had found

to not constitute judicial functions, including to:

> approve accounts of county officers before payment, *Robey v. Prince George's County*, 92 Md. 150 (1900); perform duties tantamount to a board of review in assessing property for tax purposes, *Baltimore City v. Bonaparte*, 93 Md. 156 (1901); appoint a board of visitors to supervise the county jail, *Beasley v. Ridout*, 94 Md. 641 (1902); provide for referendum concerning issuance of liquor licenses, *Board of Supervisors v. Todd*, 97 Md. 247 (1903); issue licenses permitting pari-mutuel betting on horse races, *Close v. Southern Md. Agr. Asso.*, 134 Md. 629 (1919); and issue liquor licenses, *Cromwell v. Jackson*, 188 Md. 8 (1947).

274 Md. at 226 (Atlantic Reporter parallel cites omitted). In *Todd*, for example, we

concluded that a law requiring a court "to order an election" on the question of whether to

permit issuance of a liquor license was unconstitutional because it did not relate in any way

to a judicial proceeding or judicial determination.[16] 97 Md. at 253.

Second, we have considered whether the delegating legislative body has provided

sufficient guidance for the court's exercise of its discretion such that it is not called upon

---

[16] In a somewhat related inquiry, we have considered whether tasks performed by administrative agencies rely on individual grounds and adjudicative facts as opposed to general grounds and legislative facts. *See Talbot County*, 415 Md. at 386-87. Adjudicative facts generally include "questions of who did what, where, when, how, why, [and] with what motive or intent[.]" *Id.* at 387-88 (internal quotation marks omitted) (quoting *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686, 712 (1977)). Legislative facts, by contrast, are typically "general facts which help the tribunal decide questions of law and policy and discretion." *Id.* at 388 (quoting *Woodward & Lothrop*, 280 Md. at 712). The more a task delegated to a court is based on individual grounds and adjudicative facts that resolve a specific dispute, the more likely it is to be viewed as a judicial function.

to render a decision based on policy, expediency, or politics.  Thus, in *Sugarloaf*, we held unconstitutional a Montgomery County Code provision that allowed a court, in certain circumstances where there had been an ethical breach, to void an official act "if the court deems voiding the action to be in the best . . . interest of the public."  319 Md. at 566 (omitting emphasis added in *Sugarloaf*) (quoting Montgomery County Code § 19A-22(b)).  We concluded that it was improper to provide a court with the "unguided discretion" to decide whether to allow an official act to stand based solely on the court's assessment of whether voiding the act was in the public interest.  319 Md. at 572.  That, our predecessors held, was a "question[] of policy and expediency" that was a legislative, not a judicial, function.  *Id.*

We reached a similar decision in *Cromwell*, which concerned a law that delegated to judges the task of determining whether to issue liquor licenses.  188 Md. at 11, 13.  The law required judges "to pass upon at least ten questions."  *Id.* at 25.  Several of the questions, such as those calling for determinations as to whether the petitioners lived or owned property in the vicinity and whether they believed statements in the application to be true, were not problematic because they were "questions of fact and law upon which the [j]udge is required to exercise . . . judgment after hearing the evidence."  *Id.*  The remaining questions were of a different kind.  They asked, for example, whether the applicant was "a fit person" for a liquor license; whether the place where liquor would be sold was "a proper one"; and whether there was a "[p]roper allocation of licenses" in the area.  *Id.* at 25-26.  Those questions were "not questions of law or of fact, nor mixed questions of law and

22

fact." *Id.* at 26. Instead, they were questions of "public policy or expediency depending upon many matters," with "no rule to guide the [c]ourt" in rendering a decision. *Id.*

Notably, the Court contrasted one of the impermissible questions posed by the law it struck down—whether an individual is "a fit person" for a liquor license—with the superficially similar question, addressed regularly by courts, of whether an individual is fit to have custody of a child. *Id.* at 26. As to the latter question, the Court reasoned, courts had a "firmly established," "definite guide" for the exercise of their discretion, applicable "in all cases," which is that "the welfare of the [child] is the primary consideration in determining whether a person is fit to have custody[.]" *Id.* at 26-27. The difference lay not in the terminology of the question, as both inquiries focused on the fitness of the individual, but on the existence of guidance for the exercise of the court's discretion.

**B.  The Task Delegated to the Circuit Court by Election Law § 8-103(b)(1) Is a Judicial Function.**

Before applying the two complementary factors to determine whether the task delegated by § 8-103(b)(1) of the Election Law Article is a judicial function, we must be clear on what that task is. We therefore return to the text of § 8-103(b)(1):

> If emergency circumstances, not constituting a declared state of emergency, interfere with the electoral process, the State Board or a local board, after conferring with the State Board, may petition a circuit court to take any action the court considers necessary to provide a remedy that is in the public interest and protects the integrity of the electoral process.

The provision has four components. The first three define the preconditions to court action: (1) there must be "emergency circumstances" that do not rise to the level of "a declared

23

state of emergency"; (2) those circumstances must "interfere with the electoral process"; and (3) the State Board or a local board must "petition a circuit court" to intervene.

The fourth component is the circuit court's authority, if the three preconditions are satisfied, to impose a remedy that both "is in the public interest" and "protects the integrity of the electoral process." Inasmuch as a remedy that protects electoral integrity is necessarily in the public interest to the extent that it does so, and considering the context provided by the preconditions, we interpret these dual requirements as authorizing a remedy that both (1) protects electoral integrity by addressing the emergency circumstances at issue, and (2) is not otherwise contrary to the public interest.

Applying the two complementary factors discussed above, we conclude that § 8-103(b)(1) assigns a judicial function. First, the task is of a nature that has traditionally been performed by the judicial branch, both procedurally and substantively. Section 8-103(b)(1) contemplates a decidedly judicial proceeding: initiated by a petition; implicitly allowing for the opposition of an adversarial party; setting forth statutory factors that can be established by evidentiary proof of adjudicatory facts; and, if harm meeting the statutory threshold is proven, calling for the fashioning of an appropriate remedy. Specifically, the court is called upon to determine whether particular emergency circumstances identified by a board of elections (1) exist and (2) interfere with the electoral process; as well as whether the court can impose a remedy that will (3) protect the integrity of the electoral process from the impending threat and (4) not be contrary to the public interest generally. The court is thus called upon to resolve discrete issues based on adjudicatory facts, not

24

"general facts which help the tribunal decide questions of law and policy and discretion."

*Talbot County*, 415 Md. at 387-88 (quoting *Woodward & Lothrup*, 280 Md. at 712).

With respect to substance, the Election Law Article is replete with provisions permitting, contemplating, or requiring court intervention when necessary to ensure the integrity of the electoral process. Subtitle 2 of Title 12 of the Election Law Article, titled "Judicial Review of Elections," "applies to an[y] issue arising in an election conducted under this article." Elec. Law § 12-201. Section 12-202(a) permits a registered voter to "seek judicial relief from any act or omission relating to an election, whether or not the election has been held[,]" based on an allegation that the act or omission is inconsistent with the Election Law Article or other law, or "may change or has changed the outcome of the election." In any such proceeding in which a court determines that an "act or omission materially affected the rights of interested parties or the purity of the elections process" and changed, or may change, the outcome of an election, the court is authorized to impose an appropriate remedy. *Id.* § 12-204. Such a remedy may include declaring void the result of an election already held, or postponing and rescheduling an election not yet held. *Id.* Consistent with the overarching concern of maintaining the integrity of the electoral process, all such judicial proceedings must be expedited. *Id.* § 12-203.[17]

---

[17] *See also, e.g.*, Elec. Law § 3-602(c), (d) (providing for judicial review of determinations concerning voter eligibility, and requiring the State Board to make any corrections required by court order); *id.* § 5-305(b), (d) (permitting a registered voter to file a petition in circuit court challenging the residency of a candidate and requiring expedited judicial review); *id.* § 6-209 (providing for judicial review of decisions related to sufficiency of petitions to appear on the ballot); *id.* § 9-207(b) (permitting the Supreme Court of Maryland, on petition of the State Board, to postpone the date for certifying and publicly displaying the ballot "in extraordinary circumstances"); *id.* § 9-209 (providing for

Similarly, many pages of the Maryland Reports are filled with decisions adjudicating election disputes and weighing whether judicial action was required to protect the integrity of the electoral process. *See, e.g.*, *Ademiluyi v. Egbuonu*, 466 Md. 80, 136-37 (2019) (enjoining the State Board from certifying a general election ballot because a listed candidate was not qualified); *Cabrera v. Penate*, 439 Md. 99, 101 (2014) (ordering an ineligible candidate's name removed from a primary election ballot); *Fritszche v. Maryland State Bd. of Elections*, 397 Md. 331, 347 (2007) (concluding that the Supreme Court was compelled by precedent to exclude votes contained in noncompliant absentee ballots "in order to safeguard the election process"); *Oglesby v. Williams*, 372 Md. 360, 364, 384 (2002) (declaring a candidate ineligible for failure to satisfy constitutional residency requirements); *Montgomery County v. Bd. of Supervisors of Elections for Montgomery County*, 311 Md. 512, 513-17 (1988) (enjoining the Board of Supervisors of Elections from placing certain proposed questions amending a county charter on the general election ballot because they conflicted with a public general law); *Lamb v. Hammond*, 308 Md. 286, 308-09 (1987) (holding that ballots that did not comply with statutory requirements could not be canvassed); *Fowler v. Bd. of Supervisors of Elections for Prince George's County*, 259 Md. 615, 618-19 (1970) (choosing not to invalidate an election for irregularities because no individual voter was disenfranchised); *Valle v.*

---

"judicial review of the content and arrangement, or to correct any administrative error," on the ballot once certified); *id.* § 9-404(c) (implicitly recognizing the right of a court, by order, to "extend[] the time for closing the polls"); *id.* § 11-303(d)(4)(iii) (implicitly recognizing the right of a court, by order, to "extend[] the time for closing the polls"); *id.* § 11-304 (authorizing appeals from a local board's decision to reject or not reject an absentee ballot).

*Pressman*, 229 Md. 591, 596-99 (1962) (invalidating a nomination of a candidate for State's Attorney made by a body lacking the statutory power to nominate); *Smith v. Hackett*, 129 Md. 73, 76-77 (1916) (holding that votes cast at a polling place located outside the voters' precinct were properly counted because the election supervisors, not the voters, were responsible for the improper location). Indeed, the prospect of judicial intervention is a primary check ensuring the integrity of the electoral process.

Second, the terms of § 8-103(b)(1) provide more than sufficient guidance to render a court's decision an exercise in judicial, rather than legislative, discretion. Specifically, the court may impose a remedy only if it finds the existence of emergency circumstances that interfere with an election, and its remedy must protect the integrity of the electoral process by addressing those specific emergency circumstances. Candidate Cox's contrary contention focuses almost exclusively on the requirement that the court's remedy be "in the public interest," equating that requirement to the flawed ordinance in *Sugarloaf*, which permitted a court to void an official action if it found that doing so would be "in the public interest." *See Sugarloaf*, 319 Md. at 573. Candidate Cox's reliance on that similarity in language is misplaced. As an initial matter, the sole criterion in the ordinance at issue in *Sugarloaf* was whether voiding the official action would be in the public interest, seemingly leaving the matter entirely to how the court felt about the official action. Here, by contrast, § 8-103(b)(1) also requires that any remedy protect the integrity of the electoral process. And unlike the ordinance in *Sugarloaf*, which permitted the court to make the permanent policy decision to void or maintain an official action, § 8-103(b)(1) necessarily contemplates a temporary remedy narrowly tailored to addressing an immediate threat.

27

Furthermore, contrary to Candidate Cox's argument, there is nothing inherently nonjudicial in considering whether a remedy is in the public interest. Indeed, Rule 15-504(a)(2)(D) *requires* that a court determining whether to grant a temporary restraining order consider, as one of four factors, whether granting the order would be "contrary to the public interest." We impose the same obligation on a court determining whether to issue a preliminary injunction. *See, e.g.*, *Ademiluyi*, 466 Md. at 114 (quoting *Eastside Vend Distribs., Inc. v. Pepsi Bottling Grp., Inc.*, 396 Md. 219, 240 (2006)); *State v. Falcon*, 451 Md. 138, 157 (2017) (quoting *Schade v. Md. State Bd. of Elections*, 401 Md. 1, 36 (2007)); *accord Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (identifying one of four factors that a party seeking a preliminary injunction in federal court must establish as "that an injunction is in the public interest" (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))).

The problem in *Sugarloaf* was thus not that the court was directed by the ordinance to consider the public interest. The problem was that the court was directed to make what was essentially a legislative determination based solely on the court's view of whether the official action was in the public interest. *Sugarloaf*, 319 Md. at 572-73. Here, by contrast, the circuit court's task in determining whether to impose a short-term remedy to address emergency circumstances affecting the integrity of an impending election is a judicial function. There is nothing inappropriate in the General Assembly directing the court to also consider the public interest in fashioning its remedy.

In sum, the task the General Assembly delegated in § 8-103(b)(1) is a judicial function. That delegation thus does not offend Article 8 of the Declaration of Rights and § 8-103(b)(1) is not facially unconstitutional.

### C.      The Circuit Court's Remedy Is Not Unconstitutional as Applied.

Candidate Cox contends that even if § 8-103(b)(1) is not facially unconstitutional, it is unconstitutional as it was applied in this case because the circuit court's remedy had the effect of voiding a gubernatorial veto. We disagree.

As noted, in 2022, the General Assembly passed Senate Bill 163 and House Bill 862, which would have permitted local boards to begin canvassing absentee ballots eight days before the beginning of early voting. Governor Hogan vetoed the bills. In doing so, however, he issued a statement that lauded the aspect of the bills that would have permitted early ballot canvassing. His veto, he said, was addressed to the lack of additional ballot security measures. Candidate Cox contends that the circuit court's ruling has effectively and impermissibly overridden Governor Hogan's veto.

To be sure, it is not the role of a court to wade into a dispute between the political branches to impose an outcome different from that produced by the political process prescribed by our State Constitution. That is not what occurred here. The remedy imposed by the circuit court was a temporary, emergency measure that had effect in only one election, not a modification of State law with lasting effect, and it was imposed pursuant to an express statutory authorization that was itself passed by a General Assembly and signed by a Governor. *See* 1998 Md. Laws ch. 585. Moreover, even as to the November 2022 election itself:  (1) as we will explain in more detail below, the emergency

29

circumstances pursuant to which the court acted did not exist, at least not to their full extent, at the time of the Governor's vetoes; and (2) the Governor favored permitting the early canvassing of absentee ballots, even absent emergency circumstances. In short, this was not a circumstance in which the court was asked to, or did, weigh in to tip the scales in a policy dispute between the political branches.

## II.

Candidate Cox also contends that even if § 8-103(b)(1) is constitutional, the circuit court erred in finding that "emergency circumstances" existed that justified the court's intervention. We will first discuss the meaning of "emergency circumstances," as used in § 8-103(b)(1), before turning to the court's determination that such circumstances existed and justified relief here.

### A. Statutory Construction of "Emergency Circumstances"

The goal of statutory construction "is to ascertain and effectuate the actual intent of the General Assembly." *Thornton Mellon LLC v. Adrianne Dennis Exempt Tr.*, 478 Md. 280, 313 (2022) (quoting *Mercer v. Thomas B. Finan Ctr.*, 476 Md. 652, 694 (2021)). "[T]o determine [the General Assembly's] purpose or policy, we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant." *Peterson v. State*, 467 Md. 713, 727 (2020) (quoting *Bellard v. State*, 452 Md. 467, 481 (2017)). In interpreting a statute's plain language, we "[r]ead[] the statute as a whole . . . to 'ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Spevak v. Montgomery County*, 480 Md. 562, 572 (2022)

30

(quoting *Moore v. RealPage Util. Mgmt., Inc.*, 476 Md. 501, 510 (2021)). In doing so, "[o]ur inquiry is not confined to the specific statutory provision at issue on appeal. Instead, '[t]he plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim or policy of the Legislature in enacting the statute.'" *Berry v. Queen*, 469 Md. 674, 687 (2020) (internal citation and some quotation marks omitted) (quoting *Johnson v. State*, 467 Md. 362, 372 (2020)).

If the plain language of a statute is unambiguous, "we need not look beyond the statutory language to determine the General Assembly's intent," *Peterson*, 467 Md. at 727 (quoting *Bellard*, 452 Md. at 481), although "we often find it prudent" to do so, *Berry*, 469 Md. at 687.

In its petition, the State Board argued that the anticipated volume of absentee ballots in the November 2022 general election, combined with the limited capacity of the local boards to canvass those ballots, satisfied the conditions for court intervention pursuant to § 8-103(b)(1). Taking the contrary position, Candidate Cox argued that those circumstances did not constitute "emergency circumstances" for purposes of § 8-103(b)(1). Our analysis therefore "begins by discerning the ordinary and popular meaning," *Berry*, 469 Md. at 688, of "emergency circumstances."

The ordinary meaning of "circumstances" is not controversial. A "circumstance" is "a fact or condition connected with or relevant to an event or action." *Circumstance*, *New Oxford American Dictionary* 315 (3d ed. 2010).[18] The focus of the parties' arguments is

---

[18] *See also Circumstance*, *Merriam-Webster's Collegiate Dictionary* 225 (11th ed. 2014) (defining "circumstance" as "a condition, fact, or event accompanying, conditioning,

on the meaning of "emergency," which dictionaries generally define by reference to the dual concepts of (1) urgency, i.e., a situation requiring immediate attention to prevent harm, and (2) lack of foreseeability, i.e., a situation that was unexpected or unforeseen. *See, e.g.*, *Emergency*, *Merriam-Webster's Collegiate Dictionary* 407 (11th ed. 2014) (defining "emergency" as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" and "an urgent need for assistance or relief"); *Emergency*, *New Oxford American Dictionary* 567 (3d ed. 2010) (defining "emergency" as "a serious, unexpected, and often dangerous situation requiring immediate action"); *Emergency*, *Black's Law Dictionary* 660 (11th ed. 2019) (defining "emergency" as "[a] sudden and serious event or an unforeseen change in circumstances that calls for immediate action to avert, control, or remedy harm;" or "[a]n urgent need for relief or help"). According to the popular, ordinary definitions of the terms, therefore, "emergency circumstances" are unexpected or unforeseen conditions that require immediate attention to prevent harm.[19]

The statutory context in which the relevant terms appear is consistent with the breadth of that definition. *See 75-80 Properties, L.L.C. v. Rale, Inc.*, 470 Md. 598, 624 (2020) (stating that the "meaning of the plainest language is controlled by the context in

---

or determining another[.]"); *Circumstance*, *Black's Law Dictionary* 306 (11th ed. 2019) (defining "circumstance" as "[a]n accompanying or accessory fact, event, or condition, such as a piece of evidence that indicates the probability of an event").

[19] Black's Law Dictionary also includes a definition of "emergency circumstances," by cross-reference to "exigent circumstances," that is consistent with our interpretation:

> A situation that demands unusual or immediate action and that may allow people to circumvent usual procedures . . . . Also termed *emergency circumstances* . . .

*Exigent Circumstances*, Black's Law Dictionary 306 (11th ed. 2019).

which it appears" (quoting *Md. Dep't of the Env't v. County Comm'rs of Carroll County*, 465 Md. 169, 203 (2019))). Section 8-103 contains two subsections. Subsection (a) applies "[i]n the event of a state of emergency, declared by the Governor in accordance with the provisions of law, that interferes with the electoral process[.]" Elec. Law § 8-103(a). In that context, emergency has a specific meaning defined by statute: "the imminent threat or occurrence of severe or widespread loss of life, injury, or other health impacts, property damage or destruction, social or economic disruption, or environmental degradation from natural, technological, or human-made causes."[20] Md. Code Ann., Pub. Safety § 14-101(c) (2022 Repl.) (defining "emergency"); *id.* § 14-107(a)(1) ("If the Governor finds that an emergency has developed or is impending due to any cause, the Governor shall declare a state of emergency by executive order or proclamation."). During a declared state of emergency, the Governor has the authority to postpone an election or specify alternate voting locations or systems. Elec. Law § 8-103(a).

Section 8-103(b)(1) applies to "emergency circumstances, not constituting a declared state of emergency." Thus, "emergency circumstances" for purposes of § 8-103(b)(1) are circumstances that, while emergencies, fall below the threshold required

---

[20] The current definition of "emergency" for purposes of a declared state of emergency was enacted effective October 1, 2021, pursuant to Chapter 288 of the 2020 Laws of Maryland. Before October 1, 2021, § 14-101(c) of the Public Safety Article defined an emergency as "the threat or occurrence of: (1) a hurricane, tornado, storm, flood, high water, wind-driven water, tidal wave, earthquake, landslide, mudslide, snowstorm, drought, fire, explosion, and any other disaster in any part of the State that requires State assistance to supplement local efforts in order to save lives and protect public health and safety; or (2) an enemy attack, act of terrorism, or public health catastrophe." Pub. Safety § 14-101(c) (2011 Repl.).

33

to declare a state of emergency.  The statute does not otherwise provide insight into the meaning of "emergency circumstances."[21]

Although legislative history is scant, what exists also supports a broad interpretation of "emergency circumstances" that is consistent with its plain meaning.  The predecessor statute to § 8-103 was adopted by the General Assembly in 1998 as part of a comprehensive revision of the State's election laws.  *See* 1998 Md. Laws ch. 585.  According to a drafter's note, the relevant language in Senate Bill 118 (1998), which became Chapter 585 of the 1998 Laws of Maryland, was adopted "to address the potential problem of a wide range of 'emergencies.'"  S.B. 118, 1998 Leg., 412th Sess. (Md. 1998) at 118.  That language, in turn, seems to have originated in a report of a commission formed to revise the former Article 33, then Maryland's Election Code, *see* Comm'n to Revise the Election Code, *Report of the Commission to Revise the Election Code* 56 (Dec. 1997), and also appeared in a bill analysis prepared by the Senate Economic and Environmental Affairs Committee, *see* Bill Analysis, Senate Economic and Environmental Affairs Committee, *in* Bill File for S.B. 118, 1998 Leg., 412th Sess. (Md. 1998).  Other than that thrice-repeated phrase

---

[21] The term "emergency circumstances" is used in other places in the Maryland Code in a manner that is consistent with our interpretation.  *See, e.g.*, Md. Code Ann., Env't § 9-406(b) (2014 Repl.; 2022 Supp.) (permitting action by the Secretary to provide safe drinking water "[i]f, in the judgment of the Secretary, emergency circumstances exist with respect to a need for safe drinking water"); Md. Code Ann., Pub. Safety § 12-808(c) (2022 Repl.) (permitting an owner or lessee to register an elevator unit with less than 60 days' notice "[u]nder emergency circumstances"); *id.* § 12-909(f)(1) (providing exception to requirement to provide 30 days' notice before installation of a boiler or pressure vessel "[u]nder emergency circumstances"); Md. Code Ann., Health-Gen. § 19-126 (2019 Repl.) (requiring decisions on an application for a certificate of need to be consistent with the State health plan and other standards "except in emergency circumstances posing a threat to public health").

suggesting an intent for the provision to operate broadly, the legislative history also does not shed light on the meaning of "emergency circumstances."

In sum, based on plain language and context, and consistent with legislative history, "emergency circumstances" for purposes of § 8-103(b)(1) includes any unexpected or unforeseen conditions that require immediate attention to prevent harm, but that do not rise to the level of urgency or threatened harm required for a declared state of emergency.

**B.      The Circuit Court Did Not Err in Concluding that the Anticipated Volume of Absentee Ballots in the November 2022 General Election Constituted "Emergency Circumstances" for Purposes of § 8-103(b)(1).**

Candidate Cox contends that the anticipated volume of absentee ballots expected to be cast in the November 2022 general election could not have constituted emergency circumstances as of September 2, 2022, when the State Board filed its petition, because the problem had been foreseen in time to have made a legislative change during the General Assembly's 2022 session. As support for that view, Candidate Cox points primarily to: (1) the General Assembly's passage of Senate Bill 163 and House Bill 862 in 2022; (2) Governor Hogan's veto letter, which noted that permitting pre-election day absentee ballot canvassing "would allow hard working election officials to get a much needed head start on the *deluge* of ballot envelopes" (emphasis added); and (3) the experience of the 2020 elections.

The State Board concedes that it was foreseeable that there would be an increased volume of absentee ballots cast in 2022 as compared to pre-pandemic elections. The State Board contends, however, that "[e]lection officials could not have reasonably anticipated

35

the degree to which voters would continue to use mail-in ballots after the COVID-19 health emergency had passed" and that the magnitude of the increased volume of ballots "and its effect on the electoral system statewide was entirely unknown" until after the July 2022 primary election. The circuit court agreed with the State Board. We find no error in that determination.

As noted, to constitute "emergency circumstances," the conditions at issue must reflect both urgency and a lack of foreseeability. Here, urgency is not disputed, but the record concerning foreseeability is mixed. On the one hand, Candidate Cox is plainly correct that it was foreseeable that there would be an increased volume of absentee ballots cast in 2022, as compared to all pre-pandemic elections, based on the successful use of absentee ballots by many Marylanders in the 2020 primary and general elections and laws passed in 2021 making it even easier to vote that way. Candidate Cox is also correct that the General Assembly, the Governor, and the State Board all foresaw a benefit in permitting canvassing of absentee ballots before election day to accommodate the increased volume and avoid post-election delays.

On the other hand, the record also supports the State Board's position that the full extent of the anticipated increased volume of absentee ballots, and its accompanying disruption, did not become apparent until after the 2022 primary election. The 2020 primary and general elections both occurred within the first year of the COVID-19 pandemic, at a time when many businesses and government entities remained closed and many people were venturing out of their houses only seldomly. Even so, the percentage of Marylanders who voted by absentee ballot dropped from approximately 97% in the June

36

2020 primary to approximately half in the November 2020 general election. The July 2022 primary election took place more than 20 months after the 2020 general election, more than a year after the Governor's emergency declaration was lifted, and at a time when in-person voting options had largely returned to pre-pandemic norms. Given the unprecedented circumstances that had accompanied the 2020 elections, it was thus not unreasonable to expect that the percentage of absentee ballots cast would again drop significantly.

The percentage of votes cast by absentee ballot during the 2022 primary election did indeed fall as compared to the 2020 general election, but not nearly to pre-pandemic levels. Moreover, as discussed above, processing those ballots led to significant delays in releasing election results. Given the historical trend of the number of absentee ballots cast increasing three-to-fourfold between a primary election and the succeeding general election, the experience of the 2022 primary election caused the State Board to forecast the likelihood of a volume of absentee ballots cast in that year's general election that would overwhelm the ability of local boards to process them, resulting in long delays in releasing results, missed statutory deadlines, and decreased public confidence in the integrity of the election. *See*, *e.g.*, Richard H. Pildes, *Election Law in an Age of Distrust*, 74 Stan. L. Rev. Online 100, 107 (May 2022) ("[W]e cannot ignore the continuing risk that the longer it takes to resolve the vote count, the more distrust will feed on that delay."). Significantly, there is no evidence in the record that contradicts the State Board's evidence that it was unaware of the full scope of the anticipated volume of absentee ballots to be cast in the November 2022 general election, or of the likely consequences of that volume, until after the July 2022 primary election.

For the foregoing reasons, we find no error in the circuit court's determination that the conditions confronting the State Board at the time it filed its petition constituted "emergency circumstances . . . [that] interfere with the electoral process." The circuit court thus correctly rejected Candidate Cox's challenge to the court's authority to impose "a remedy that is in the public interest and protects the integrity of the electoral process." For that reason, we affirmed the circuit court's judgment.

To provide guidance for future proceedings under § 8-103(b)(1), we offer one final note. In the circuit court and on appeal, Candidate Cox challenged the authority of the circuit court to impose a remedy. He did not, however, challenge any specific aspect of the remedy requested by the State Board or imposed by the circuit court. As a result, we have no opportunity here to assess the appropriateness of the particulars of the remedy. However, because such proceedings do not require participation of an opposing party who might be able to seek further review in future proceedings, we make two observations. First, as the State Board conceded at oral argument, any remedy a circuit court imposes pursuant to § 8-103(b)(1) must necessarily be tailored to address only the particular "emergency circumstances . . . [that] interfere with the electoral process." Second, considering the extraordinary and potentially non-adversarial nature of proceedings under § 8-103(b)(1), it is incumbent upon a court to scrutinize the evidentiary support for a petition to ensure that the petitioning board carries its burden not only as to the circumstances justifying court intervention but also as to the particulars of the remedy sought. The court's ruling on a petition should therefore explain the basis for the court's

conclusion that its remedy is appropriately tailored to address the particular emergency circumstances at issue without going further than is necessary under the circumstances.

## CONCLUSION

In summary, we hold that: (1) § 8-103(b)(1) of the Election Law Article does not violate the separation of powers guaranteed by Article 8 of the Maryland Declaration of Rights, either on its face or as applied in this case; and (2) the circuit court did not err in determining that the State Board carried its burden of demonstrating that the anticipated volume of absentee ballots to be cast in the November 2022 general election constituted "emergency circumstances, not constituting a declared state of emergency, [that] interfere with the electoral process," *see* Elec. Law § 8-103(b)(1).

For those reasons, we affirmed the opinion and order of the Circuit Court for Montgomery County entered on September 26, 2022.

Circuit Court for Montgomery County
Case No. C-15-CV-22-003258
Argued: October 7, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 21

September Term, 2022

_____

IN RE: PETITION FOR EMERGENCY
REMEDY BY THE MARYLAND STATE
BOARD OF ELECTIONS

_____

Fader, C.J.
Watts
Hotten
Booth
Biran
Eaves
Adkins, Sally D. (Senior Justice,
    Specially Assigned),

JJ.

_____

Concurring Opinion by Biran, J.

_____

Filed: March 29, 2023

* At the November 8, 2022 general election, the
voters of Maryland ratified a constitutional
amendment changing the name of the Court of
Appeals of Maryland to the Supreme Court of
Maryland. The name change took effect on
December 14, 2022.

I join the Opinion for the Court in full. As Chief Justice Fader explains, Intervenor Daniel Cox challenged only the authority of the circuit court to impose a remedy in the circumstances presented by this case. He did not challenge the specifics of the remedy that the circuit court ordered. I write separately to underscore the Court's statement that any remedy a circuit court imposes under Election Article § 8-103(b)(1) "must necessarily be tailored to address only the particular emergency circumstances that interfere with the electoral process." Slip op. at 38 (cleaned up).

The State Board of Elections (the "Board") requested that, to address the emergency it identified, the circuit court issue an order permitting the canvassing and tabulation of absentee ballots to begin on October 1, 2022. The circuit court issued an order that included the October 1 start date.

At oral argument before this Court – which occurred on October 7, 2022 – counsel for the Board stated that few absentee ballots had arrived at the local boards as of that date. Based on past experience, the Board believed that the number of absentee ballots arriving at the local boards would increase "exponentially" once early (in-person) voting began on October 27. When asked why, therefore, a start date for canvassing and tabulating of absentee ballots of October 1 was necessary to address the emergency, counsel for the Board stated that the local boards needed all of October to plan how to allocate their space and staff in order to perform all the necessary tasks related to the general election.

In my view, the local boards needed no emergency relief as of October 1 to begin planning how to allocate their space and staff for the rest of October. If the circuit court had ordered canvassing and tabulating of absentee ballots to begin no earlier than October

15, 2022 or another date around that time, it seems likely that the local boards would have been able to perform their work as effectively as they did with a start date of October 1. Thus, I am skeptical that the October 1 date went no farther than necessary to address the emergency that confronted the State's election officials.

If, in the future, the Board petitions a circuit court for emergency relief under § 8-103(b)(1) of the Election Article, the Board should provide the circuit court with evidence establishing that the requested relief is tailored to address the present emergency. If the circuit court finds that there is an emergency that warrants relief, the court should then make findings as to whether the requested relief is tailored to address the emergency and, if it is not, the court should grant different relief that is so tailored.