*In the Matter of William Pughsley*, No. 1489, Sept. Term 2023. Opinion by Beachley, J.

**Voting rights – disqualification under Election Law § 3-102(b)(2) – adults under guardianship for mental disability – erroneous legal standard.**

Maryland's voter disqualification statute applies only when an otherwise qualified individual who "is under guardianship for mental disability and a court . . . has specifically found by clear and convincing evidence that the individual cannot communicate, with or without accommodations, a desire to participate in the voting process[.]" Md. Code (2003, 2022 Repl. Vol.), § 3-102(b)(2) of the Election Law Article ("EL"). Here, the circuit court erred in disqualifying the adult under guardianship from voting, by erroneously engrafting an additional, impermissible test requiring the prospective voter to demonstrate a "base level understanding of the political process, of why he's voting for a particular person[.]"

**Voting rights – adults under guardianship for mental disability – accommodations.**

Compounding its error in applying the wrong legal standard for disqualification, the circuit court also improperly denied "accommodations" to assist the prospective voter in communicating his "desire to participate in the voting process[.]" *See* EL § 3-102(b)(2). To the extent the court misunderstood the statute to preclude such assistance, the court erred as a matter of law. To the extent the court applied the statute in refusing such assistance, the court abused its discretion in these circumstances.

**Supported Decision-Making Act, Estates & Trusts § 18-101 et seq. – adults under guardianship for mental disability – statutory requirements for valid agreement.**

The circuit court also erred by relying on the incorrect disqualification standard to deny a joint request for a supported decision-making agreement ("SDMA") permitting guardians/parents to provide support in registering and voting, Yet the lack of any written proposal satisfying the specific statutory requirements for SDMAs hindered efforts by court and counsel to interpret and implement this new statutory tool. On remand for reconsideration of voting rights, any request for approval of an SDMA, whether limited to voting rights or extending to other matters, must comply with all statutory criteria and be approved by the court.

Circuit Court for Prince George's County
Case No.: CAE06-04707

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1489

September Term, 2023

_____

IN THE MATTER OF WILLIAM PUGHSLEY

_____

Arthur,
Beachley,
Wright, Alexander, Jr.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Beachley, J.

_____

Filed: June 2, 2025

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

In Maryland, "[a]n individual is not qualified to be a registered voter if the individual . . . is under guardianship for mental disability and a court of competent jurisdiction has specifically found by clear and convincing evidence that the individual cannot communicate, with or without accommodations, a desire to participate in the voting process[.]" Md. Code (2003, 2022 Repl. Vol.), § 3-102(b)(2) of the Election Law Article ("EL").

In this appeal, we are asked to decide whether the Circuit Court for Prince George's County erred or abused its discretion in denying requests by appellee William Pughsley, who is under guardianship for mental disability, and his parents, appellants Samuel and Juanita Pughsley ("Parents"), who serve as his guardians, that William be afforded the right to vote with Parents' assistance, under a supported decision-making agreement ("SDMA") adopted in accordance with the Supported Decision-Making Act (the "Act"), *codified at* Md. Code (1974, 2022 Repl. Vol.), § 18-101 *et seq.* of the Estates & Trusts Article ("E&T"). After hearing testimony from William and arguments by his counsel and counsel for Parents, the court found by clear and convincing evidence that William "lacks sufficient capacity to understand the voting process and/or to effectively communicate a desire to participate in the voting process, even with the help and guidance of supported decision-makers." Although the court modified William's existing guardianship of the person by appointing Parents as guardians of William's property, it denied requests to (1) grant William "the right to register to vote and to vote"; (2) modify the terms of William's guardianship of the person for the purpose of authorizing Parents to assist him in voting; (3) approve the appointment of Parents as William's "Supported Decision-Makers" under

an SDMA, and (4) approve the appointment of William's aunt and a family friend as successor supported decision-makers.

Parents noted this timely appeal, raising the following issues:

1. Was it error for the [c]ourt to associate William Pughsley's capacity to vote with the level of capacity needed for him to request appointment of supporters under the Maryland Supported Decision-Making Act?

2. Was it error for the [c]ourt to fail to rule on the petition for the appointment of Juanita Pughsley and Samuel Pughsley as Supported Decision-Makers and for the appointment of Andrea Waring, then Dr. Yulanda Swindell, M.D., as successor Supported Decision-Makers?

Although William "disagrees with the Parents' . . . interpretation [of the Act] that this new law has a general judicial 'appointment' element[,]" he contends that the court "erred by assessing [his] capacity to vote in forced isolation, without evaluating how the Parents could support him." William frames this challenge as follows:

Did the trial court—after correctly viewing the supported decision-making act as the core of [his] request to limit the guardianship so as to provide him voting rights—nevertheless err by barring [his] parents from supporting him during his testimony[?]

We conclude that the circuit court erred by applying the wrong legal standard in disqualifying William from voting and in denying Parents' SDMA petition for that reason. For reasons that follow, we will vacate the order denying Parents' petition and remand for further proceedings regarding both voting rights and supported decision-making.

### *Voting Rights and Maryland's Supported Decision-Making Act*

As essential background for our discussion of the issues raised by William and his Parents, we first examine the constitutional and statutory provisions at the heart of this appeal.

The right to vote is constitutionally protected under the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. *See* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."); *Bush v. Gore*, 531 U.S. 98, 104 (2000) ("When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.").

Under Article I, § 2 of the Maryland Constitution, our General Assembly is required to establish "a uniform Registration of the names of all the voters in this State, who possess the qualifications prescribed in" Article I, §§ 1 and 4. Such registration is "conclusive evidence . . . of the right of every person . . . to vote at any election thereafter held in this State." *Nader for President 2004 v. Maryland State Bd. of Elections*, 399 Md. 681, 686-87 (2007) (alterations in original) (emphasis removed) (quoting Art. I, § 2 of the Md. Const.).

Under Article I, § 4 of the Maryland Constitution, the only "two instances in which an individual otherwise qualified to vote may be denied the right to vote" are (1) when that "person is 'convicted of an infamous or other serious crime' or (2) if the person is 'under care or guardianship for a mental disability.'" *Id*. at 687-88 (quoting Art. I, § 4 of the Md. Const.). "The Constitution does not require, and, thus, does not allow for the disqualification of voters, otherwise qualified to vote, on any other basis." *Id*. at 688.

3

Maryland is among the states that do not automatically disqualify a voter for being under a guardianship based on an adjudication of mental disability. *See generally* Michele J. Feinstein & David K. Webber, *Voting Under Guardianship: Individual Rights Require Individual Review*, 10 Nat'l Acad. Elder L. Att'ys J. 125, 133-38 (Fall 2014) (analyzing range of voting rights standards). Instead, the General Assembly has authorized voter disqualification of persons under guardianship only after an individualized judicial inquiry. *See id.* at 137-38. In pertinent part, EL § 3-102(b)(2) provides:

(b) An individual is not qualified to be a registered voter if the individual:

. . .

(2) is under guardianship for mental disability *and a court of competent jurisdiction has specifically found by clear and convincing evidence that the individual cannot communicate, with or without accommodations, a desire to participate in the voting process*[.]

(Emphasis added).

In addition to protecting voting rights of adults under guardianship for mental disability, Maryland has recently enacted more statutory protections designed to assist such adults in making significant "life decisions." In 2022, the General Assembly enacted the Supported Decision-Making Act, directing that it should "be liberally construed and applied to promote its underlying purposes and policies." *See* 2022 Md. Laws ch. 631 (S.B. 559); E&T § 18-102(b). The Act authorizes "[s]upported decision making[,]" which it defines as "a process by which an adult, with or without having entered a supported decision-making agreement, utilizes support from a series of relationships in order to make,

4

communicate, or effectuate the adult's own life decisions." E&T § 18-101(b). The stated purpose of this Act

> is to assist adults by:
>
> (1) Obtaining support for the adult in making, communicating, or effectuating decisions that correspond to the will, preferences, and choices of the adult; and
>
> (2) Preventing the need for the appointment of a substitute decision maker for the adult, including a guardian of the person or property.

E&T § 18-102(a). Nevertheless, "[t]he availability of a supported decision-making agreement is not intended to limit the informal use of supported decision making or to preclude judicial consideration of informal supported decision-making arrangements as a less restrictive alternative to guardianship." E&T § 18-104(e).

"All adults are presumed capable of making a supported decision-making agreement[,]" E&T § 18-103(b), which is defined as

> an arrangement between an adult and a supporter or supporters that describes:
>
> (1) How the adult uses supported decision making to make decisions;
>
> (2) The rights of the adult; and
>
> (3) The responsibilities of the supporter or supporters.

E&T § 18-101(c).

Under the Act, there is a broad range of matters that supported decisions may cover. Specifically:

> (a) An adult may utilize supported decision making to:
>
> (1) Increase the adult's self-determination;

5

(2) Prevent the need for the appointment of a substitute decision maker; or

(3) Limit or terminate the use of a substitute decision maker.

E&T § 18-103(a).

Under this statutory framework, "a supporter may be any person chosen by the adult[,]" E&T § 18-106(a), who agrees to "provide support in making, communicating, or effectuating the adult's own life decisions." E&T § 18-101(d). The supporter may

> provide support to the adult in making decisions in areas of the adult's choosing, including:
>
> (1) Gathering information;
>
> (2) Understanding and interpreting information;
>
> (3) Weighing options and alternatives to a decision;
>
> (4) Understanding the consequences of making or not making a decision;
>
> (5) Participating in conversations with third parties with the adult's explicit authorization; and
>
> (6) Providing the adult with support and advocacy in implementing a decision.

E&T § 18-104(c).

A supporter has a duty to "[a]ct honestly, diligently, and in good faith" "within the authority given in the supported decision-making agreement[.]" E&T § 18-105(a)(2)-(3). A supporter "shall . . . [s]upport the will and preference of the adult" without regard to "the supporter's opinion of the reasonableness of the adult's wishes, preferences, or choices[.]" E&T § 18-105(a)(1). Because "[t]he relationship between the adult and the supporter shall be one of trust and confidence that preserves the decision-making authority of the adult[,]"

6

E&T § 18-105(b), the supporter may not "[m]ake decisions on behalf of the adult[,]" "[e]xert undue influence on the adult[,]" or otherwise "[c]oerce the adult[.]" E&T § 18-105(c)(1)-(3).

Among the defined boundaries governing supported decision-making, such an agreement also must "[b]e documented in writing" with witnessed signatures, and must "document how the adult selected the supporter[.]" E&T § 18-107(b)(1), (7), (11). "Execution of a supported decision-making agreement may not be a condition of participating in any activity, service, or program." E&T § 18-104(f). Most importantly for purposes of this appeal,

> [i]f a person under guardianship enters into a supported decision-making agreement under this title, the agreement does not supplant the authority of a guardian of the adult, unless the court authorizes the limitation or removal of guardianship due to the existence of a supported decision-making agreement.

E&T § 18-104(b)(1)(i).

The agreement "shall" state these limitations and may not "[a]uthorize the supporter or supporters to act on behalf of the adult[.]" E&T § 18-107(b)(9)(ii)(1). "An adult utilizing a supported decision-making agreement may . . . [r]evoke [it] at any time orally, in writing, or otherwise by expressing the adult's specific intent to" do so. E&T § 18-108(1).

### *Facts and Legal Proceedings*

At the time of these proceedings, William Pughsley, born in February 1987, was residing in a group home in Bowie. His parents were appointed as guardians of his person on May 12, 2006, based on a finding by the Circuit Court for Prince George's County that

7

William has a permanent intellectual disability that renders him lacking "capacity to make or communicate responsible decisions concerning his person . . . because of a mental disability or disease[.]"

By petition filed on April 24, 2023, Parents asked the court "to modify the current Guardianship order" in four respects: (1) to "allow William the right to vote;" (2) to appoint Parents as guardians of William's person and property, with authority to open and maintain bank accounts, secure public benefits, and manage assets; (3) to name Parents "as Supported Decision Makers for William," under E&T § 18-103; and (4) to name "William's family friend Andrea Waring, and aunt, Dr. Yulanda Swindell, M.D., as successor Supported Decision Makers," under E&T § 18-107(c)(2).

In support, Parents filed a Physician's Certificate under Md. Rule 10-202(a), identifying William's diagnoses as of January 10, 2023, as "intellectual impairment," "speech impairment," and "scoliosis," with "moderate" "[m]emory, cognitive, and executive functioning" and the need for appropriate support to live in the community. According to the examining doctor, William was "unable to make decisions regarding: his finances/if he should or should not have a medical procedure done. Emergency situations such as electricity problems/basement flooding" and "[d]ecisions such as needing a lawyer or any professional."

Likewise, a licensed clinical social worker assessed that William's "[i]ntellectual impairment," although "moderate" with respect to "cognitive function," "severely impacts [his] ability to make complex decisions and ability to communicate clearly." In her opinion, he needed a guardian of his property because he was able to make "simple daily

8

decisions regarding what he wants to do, clothes to wear, food to eat[,]" but unable to make "[c]omplex decisions regarding medical procedures, safety issues; organizing tasks, finances."

In response to Parents' Petition, William, through his counsel, "consent[ed] to the relief sought."

On August 18, 2023, the circuit court held a hearing on the petition, at which William and Parents were present and represented by separate counsel. Parents sought "to do two things," which counsel identified as, first, "address[ing] property" by modifying the existing guardianship to add Parents as guardian of William's property, and second, "also to have an exception to allow William to vote." Counsel for William consented to expanding the guardianship to encompass property. After meeting at William's group home in Bowie "with Andrea Waring, who is the family friend who is proposed as one of the supported decision-makers[,]" counsel observed that "she is very familiar with him, the comfort level is there."

Counsel for Parents proffered that they had been "unofficially" handling William's financial affairs, including "three accounts" consisting of "a 401k" valued at $86,908.90; a bank account with $1,078.47; and a Maryland ABLE account valued at $7,801.27. When counsel for Parents noted that "the time is now to make that official and also address the voting issue[,]" William's counsel added that "they're in the process of opening an ABLE account" and "there's just an increasing level of sophistication from a financial level that makes it a little bit more than being the representative/payee of Social Security." In

addition, counsel for Parents proffered, "William will say if asked . . . that he does desire to vote in elections and exercise his right."

Stating "I think I'm going to have to hear from him," the court took William's sworn testimony:

THE COURT: Okay. So William, can I get you to raise your right hand, please? And mom, dad, I know it's tough. But you cannot help him.

Mr. S. PUGHSLEY: Sorry, Your Honor.

THE COURT: Okay. William?

WILLIAM PUGHSLEY: Yeah.

THE COURT: And let me tell you something, I still don't know my left from my right. So I understand. But I need you to raise your other right hand. No, the other right hand. Okay. Go ahead.

WILLIAM PUGHSLEY

(The Petitioner, is duly sworn according to law, and testifies as follows:)

THE COURT: All right. Very well. Go ahead, [counsel for Parents]:

DIRECT EXAMINATION,

BY MR. PENN:

Q: William, how are you doing today?

A: I'm doing all right.

Q: I'm going to ask you a question or two, is that okay with you?

A: Yeah.

**Q: Do you want to vote in the election?**

10

**A:**          **Yeah.**

**Q:**          **Do you think that's important for you to do?**

**A:**          **Yeah.**

**Q:**          **Do you think you'd be able to do that on your own if we gave you some help?**

**A:**          **Yeah.**

Q:          So William, why do you want to vote in the election? So let me start with this question. What made you decide that you wanted to vote? So let me ask this question. How did the subject of voting come up? Let me ask you this question. Are you able to tell me or give me the name of at least one Republican person that might be in the running for – I assume we're talking about the president, are we talking about for president?

A:          Um-hum.

**Q:**          **So can you give me the name of one republican person that may be in the running for president.**

**A:**          **Biden.**

THE COURT:    I didn't quite understand. Now you can help me. What did he say, Mom?

MR. PENN:     Biden.

MR. MAGINNIS [COUNSEL FOR WILLIAM]: I thought I heard Biden.

MS. PUGHSLEY:  He said Biden.

MR. PENN:     Biden.

Q:          Biden. Is that what you said?

A:          (No audible response).

**Q:**          **And can you give me the name of one democratic person that might be in the running for president?**

11

A:      **Kamala Harris.**

THE COURT:      What did he say?

MR PENN:      Harris, Kamala Harris.

THE COURT:      Okay.

Q:      **And why is it important for you to want to vote? Can you tell me what's important to you when it comes to voting? All right. So counsel.**

A:      **(No audible responses)**

MR. PENN:      Can I further inquire?

THE COURT:      Sure.

BY MR. PENN:

Q:      **When you're at home with your parents or – when you're home with your parents, do you all talk about voting?**

A:      **Yeah.**

Q:      **I want you to think back for me. Have you ever had a favorite president?**

A:      **Obama.**

Q:      Obama was your favorite?

A:      Yeah.

Q:      Do you think that he did a good job as a president?

A:      Yeah.

Q:      **Do you care about who is the leader of the country?**

A:      **Yeah.**

Q:      Why?

12

| | |
|---|---|
| THE COURT: | And let me just ask him this. And what is the leader of the country called? |
| Q: | Can I ask it, Your Honor? |
| THE COURT: | Sure. |
| **Q:** | **If I saw Barack Obama, would I call him Mr. Obama or what would you call him? Who lives in the White House?** |
| **A:** | **The president.** |
| **Q:** | **The president lives in the White House?** |
| **A:** | **Yeah.** |
| THE COURT: | Any other questions? |
| MR. PENN: | No further questions. |
| THE COURT: | Mr. Maginnis? |
| MR. MAGINNIS: | No questions, Your Honor. |
| THE COURT: | **So my concern is, I don't know that I'm getting really a base knowledge from him about the president.** I mean, I get that he recognizes that there is one. But you know – and I had no issues with the fact that – I mean, he did mention two democrats and did not mention a republican person. So I'm trying to figure out – I mean, my understanding is that the whole point of this is to assist somebody who has some level of understanding and knowledge with making a decision and to kind of guiding them through. But **I feel like I have to come to a determination that he has to have some base level of understanding of the political process, of why he's voting for a particular person, and I'm not getting that.** |

(Emphasis added).

13

Disagreeing with that standard, counsel for Parents emphasized that "the election law, which I believe was changed in 2016[,]" states in relevant part that the court must find "by clear and convincing evidence that the individual can not communicate with or without accommodations a desire to participate in the voting process." The court, noting it "read the statute[,]" explained:

> **But my issue is, he has expressed a desire when you asked him. But when I asked him the very basic questions, he's not able to respond**.
>
> * * *
>
> And so the concern that the Court has is **he's just being responsive, but he's not being assertive, in any form, on the issue.**

(Emphasis added).

Counsel for Parents again disagreed that William should be required to articulate an understanding of the political process, taking the

> position . . . that's an additional requirement, additional burden, that's not within the statute. That was considered at the time this was drafted by the legislature. The issue is, what is his desire and can he express it. He's done so and met the threshold requirement of the statute. And otherwise, he is not a person who committed a crime, he is entitled to vote. And I don't think the Court's in a position to infringe and add additional things.
>
> [S]o many folks in the average public don't know who the vice president is. So he has identified both . . . current candidates, who the current [president] is, (inaudible) knows who lives in the White House, can identify the past presidents. I think that, frankly, represents about the base level knowledge of the average American citizen with respect to politics. (Inaudible) many folks who do have the right and were never questioned don't know anything about politics, but they still have the desire to vote.
>
> The question is not his knowledge base therefore, or whether his parents talked to him, or whether they're lifelong democrats, or lifelong republicans. None of that is to question as to infringing upon his right to vote. It simply is can he express his desire to vote. And he's done so.

14

The court then issued its ruling on the request for guardianship of property and for voting rights. Finding "that there already is an order that appoints his parents as guardian of the person[,]" "that we are proceeding by a consent" regarding "assets that need[] to be managed or benefits that may need protection[,]" and that Parents "have been taking care of this matter for some time[,]" the court stated that it would appoint Parents "to serve as guardian[s] of the property." "On the issue of the Supportive Decision Act," the court rejected counsel's argument, stating, "I don't agree that he has sufficiently expressed his desire on this issue. And so the request for that is denied."

Just minutes after going off the record, court and counsel returned for additional discussion and findings on both the property guardianship and William's "request . . . to carve out an exception in the order as related to his ability to vote[.]" Acknowledging the court's denial of that request, counsel for Parents requested clarification as that ruling relates to "supportive decision-making and [the] supportive decision-making act." The court replied:

> **The ruling is that I don't believe he's sufficiently expressed a desire with respect to voting.** As I sa[i]d on the record, **I believe he was responsive, but I don't believe that he independently sufficiently expressed the desire.**

(Emphasis added).

In response, counsel for William requested clarification that the court also was denying the "supported decision aspect of the petition[]" that sought to appoint Ms. Waring and Dr. Swindell as substitute supporters. When counsel expressed "surprise[]" at that ruling, the court explained that "it was my understanding that the reason she was going to

15

be appointed was to help him make the decisions.  She was the supportive person to help him make the decision with respect to voting."

Counsel for William immediately disputed that interpretation, explaining that William was seeking authorization for a supported decision-making agreement that would supplement his guardianship, in a manner that encompasses, but is not limited to, authorizing Parents to support William so that he could vote.

MR. MAGINNIS:   No, . . . it's a general – again, it's a new statute to all of us.  And it's a statute that to me, as I read it for the first time can, and by scheme is intended to potentially coexist with the guardianship at the same time.

* * *

THE COURT:   So let me ask you this then.  So was it you all's intent to have a general application of that act?  Because the only thing you raised or talked about was the voting.  You didn't discuss it in general terms.

MR. MAGINNIS:   That's fair.

THE COURT:   You wanted a carve out and you wanted it only to apply to voting.

MR. MAGINNIS:   Yeah.

THE COURT:   And now you're it [sic] for just general just for everything for him –

MR. PENN:   It was in two parts . . . .  One general and two –

THE COURT:   I guess my problem is, how am I going to figure out if I can ask him about what it is he's expressing a desire for if it's – because then it seems to me like it's going to be a general document out there just for their use or whatever.  But then I've got to come to a conclusion that he can sufficiently express a desire to make whatever decisions there is to be made, right?

16

MR. PENN:        Or in the alternative, the Court can recognize that the parents are longstanding guardians of the person and that they can make the application. And that it is their desires that are being advanced before the Court. And it's their request, not his request, as articulated. That's actually how I understood it coming in. Again, I would be wrong about how it's supposed to work, but that's how I see it.

THE COURT:       But then my problem is, if I just use voting as an example, **they came in here today because they wanted to use it to help them vote. And as far as I can tell, I didn't see that he really had much – that he was able to independently express that desire not to my satisfaction.** And so if that just existed and the[y] didn't come in here and I said generally speaking, the parents can do whatever, because they're his parents and they've been there for a long time, and they've taken care of him and they're reasonable people, and so on and so forth.

                 **But had they come in here on the voting issue I would have said no, like I did. And so no I'm trying to figure out so then how do I do that if – because I'm just giving them kind of carte blanche. And so in this instance, had they not had to come in here, they would have moved on with the voting. And really then, as far as I can see, just imputed their decision for his decision** for real. I mean, that's – do you see what I'm saying?

MR. PENN:        I do. But I feel like we might, by focusing so hard on the voting, we might have mostly tied the two issues that was intended. Do you remember how infused I was and how positive I was in the beginning, I met so many people.

THE COURT:       Right.

MR. PENN:        And I think they're two advanced supported decision-makers. As I read the statute, **I agree there's a belt and**

17

**suspender component to it here, because we have a guardianship.** I also think as I read the statute –

THE COURT: **No, no, no.**

MR. PENN: **The two things can co-exist. But it's really just a way of designating at a bit of a lighter legal level, . . . that there a[re] two individuals that are recognized. There's an agreement that goes into place with it. That agreement would be signed, I think by the parents in the case.** That we've got two individuals people that are recognized at . . . a lighter level of support, but there's something about these two people that makes them a higher tier in the constellation of [supporting] people. So that's how I see it and that's the way I thought the request was.

\* \* \*

THE COURT: **But the issue for me is not the people, it's the purpose.** That's my issue. I think they're probably grand people. I'm looking at his 401k they've been managing, there's almost $90,000 sitting in it.

I mean, I don't have any issue with who they are. **My issue and concern is a possible substitution of decision-making.** If there was someone here that was maybe on the autism spectrum, but maybe midway.

Like my neighbor. **She could discuss with me some level of politics. But just the conversation may need to be tweaked a little bit to kind of get her to understand some thing or to talk at a more fundamental level to make sure that she understands before she kind of pulled that kind of lever. I wasn't even getting that from William.**

MR. PENN: (Inaudible) we are.

MR. MAGINNIS: Nor was I. I heard the same thing the Court did with respect to the voting issue. So that's how where I am at all. And I did misread it. I was reminded that the request before the Court is to, as an additive to

18

guardianship, to identify the parents or the decision-makers. I think there's a little bit of estate planning going on here, that the parents are getting older, they're retired. And that's why they're also appointing us as supportive decision-make[r]s, and the family friend and the aunt and successor. I just think that's where this is going. It's just lo[n]g term planning.

THE COURT: And I get all that. **I still feel like I'm just giving a carte blanche level of decision-making out there that's not supported by what's needed by the statute.**

**I don't see that William is that kind or has that level of understanding and capacity to support the granting of supported decision-making document.**

MR. MAGINNIS: I think that the challenge that I'm having intellectually . . . (inaudible). But I understand the Court's concern is how these t[w]o statutes can coexist then. If there's a finding of mental impairment, such as William, for guardianship of his person or his property, in this case both, is it that he can not express his intent or desire to have supportive decision-makers. I mean, on the voting issue, I understand your situation. But –

THE COURT: **But I'm going to make it global. Because I kind of feel like if I ask him on any issue I might kind of get the same general response. And I think the two statutes can exist, just not for William. I think he's not the one.**

MR. MAGINNIS: So as to William, that's what I'm trying to understand, satisfy the Court's questions as to whether or not appointing decision-makers for him.

THE COURT: Correct.

And another alleged disabled person, . . . another person who might have a higher level of capacity that he has maybe yes.

19

MR. MAGINNIS: I understand. A person, using an example that you gave earlier, a person with a higher level of say autism has different abilities than we –

THE COURT: **Or a level that would allow them to have understanding, some base understanding.** Because I've read it and . . . tried to hash through it beforehand too.

* * *

And we kind of looked at it too, because at first I was like, how can that work. And frankly, . . . you might notice that I adjusted my wording when I came around to appointing the guardian of the property. Because then I felt a little conflicted when I came around to say; okay, and he lacks capacity. Because now in order for me to appoint them as guardian of the property, I've got to say he lacks capacity to make or communicate responsible decisions. **So in the one hand you're asking me to say that he's enough to be able to say I want a supported decision. And then on the other hand in the same proceedings, you're saying now I want you to appoint a guardian of the property and say that he lacks capacity. So it does kind of conflict.**

However, when I got to that point, I saw it coming in my speech and **I thought okay, how can I make this make sense. And that's when I said he lacks sufficient capacity with this particular aspect.** And that's why I specifically went on [to] talk about the complications, and those ABLE accounts, and managing those monies and applications and so and so. So I tried to target the lack of capacity just to that so that it would even make sense. Because I kind of stuttered when I was coming up on the words in my mind, I thought, well, wait a minute. So that's why I specifically did that.

But on the other hand, as far generally speaking, **I stand by what I say about . . . if he were my neighbor, then I could have said, yeah, Kayla, no, she can't handle these applications and this money and so I'm going**

20

**to gran[t] guardian of the property. But on the other hand, she does know some level of politics and so and so. And she has expressed to me that she wants someone to help her make those decisions and decide between two, a republic[an] and democratic candidate to help her come to a decision. But I just didn't get that with William.**

MR. MAGINNIS:     I understand. I understand the fin[e] line in which I was walking to almost (inaudible). Although there are high functioning folks who have practiced in say mathematics or politics. He (inaudible) appreciate that and understand that. And with respect to the supported decision-maker a[c]t, generally speaking, that it's the Court's view is the only person for whom his testimony is what matters? Or are there (inaudible) considerations that are given (inaudible).

THE COURT:     Well, definitely the greater focus is on William, for sure. And almost 99 percent I would say, you know. And I'm leaving a one percent, because I never close myself in. But at least kind of to get started, for sure William is the base. **Because it even starts with, pursuant to this statute, his express . . . desire. Until he's able to express a desire, we don't go anywhere from there.**

MR. MAGINNIS:     It's an interesting intellectual question with the new statute. I'm trying to clarify with the Court. I understand it now.

And **I think that particularly in light of the questions that the Court asked, as well as the questions I understand how you might come to the conclusion that he doesn't have a base level of (inaudible)[.]** I understand that.

MR. PENN:     (Inaudible), I understand that.

* * *

THE COURT:     But if you go out here and you find something else, or some case, or something that persuasive, even if it's not in this jurisdiction, since it is so new, **I'm open to a**

21

> **motion to reconsider while we kind of fish our way through it.**

(Emphasis added).

By written "Order Denying Petition to Modify Guardianship," the court denied the

request[] that William Pughsley be granted the right to register to vote and to participate in the voting process, following the appointment of Juanita Pughsley and Samuel C. Pughsley as supported decision-makers and the appointment of Andrea Waring, then Dr. Yulanda Swindell, MD, as successor supported decision-maker. . . . Upon consideration of the testimony and evidence presented, **this Court finds by clear and convincing evidence that William Pughsley lacks sufficient capacity to understand the voting process and/or to effectively communicate a desire to participate in the voting process, even with the help and guidance of supported decision-makers.**

(Emphasis added). The court also generally denied the request to modify the guardianship

of William's person, without specifically addressing Parents' request to approve them as

supported decision-makers.

### *Standards Governing Review*

Adult guardianship matters are subject to a "tri-partite and interrelated standard of

review." *In re Meddings*, 244 Md. App. 204, 220 (2019). We review legal decisions

regarding constitutional and statutory rights "without deference" to determine whether the

court applied the correct law. *Id. See also In re Emergency Remedy by Md. State Bd. of*

*Elections*, 483 Md. 371, 391 (2023); *cf. Mayor of Ocean City v. Comm'rs of Worcester*

*Cnty.*, 475 Md. 306, 311-12 (2021) ("Our interpretation of the Maryland Constitution is a

question of law; therefore, we review a circuit court's interpretation of the Maryland

Constitution under a *de novo* standard."); *Wheeling v. Selene Fin. LP*, 473 Md. 356, 373

22

(2021) ("Where questions of law and statutory interpretation are presented, this Court reviews them *de novo*[.]").

With respect to factual findings, we "give due regard to the opportunity of the trial court to judge the credibility of the witnesses[,]" Md. Rule 8-131(c), reviewing the evidence to determine whether the court's factual findings were clearly erroneous, by asking whether "there is competent or material evidence in the record to support the court's conclusion." *Lemley v. Lemley*, 109 Md. App. 620, 628 (1996). Finally, on the ultimate conclusion about what the terms of a guardianship will be, we will not disturb the trial court's decision "unless there has been a clear abuse of discretion." *Meddings*, 244 Md. App. at 220. In this context, abuse of discretion may exist when "'no reasonable person would take the view adopted by the . . . court,'" "when the court acts 'without reference to any guiding rules or principles[,]'" or when "the ruling under consideration is 'clearly against the logic and effect of facts and inferences before the court[.]'" *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 312 (1997) (quoting *North v. North*, 102 Md. App. 1, 13 (1994)).

### *Appellate Challenges*

As William points out, he and Parents "both question the Circuit Court's navigation of the [Act], but for different reasons." Parents contend that the court committed legal error by "associating" William's "capacity to vote with the level of capacity needed for him to request appointment of supporters under the" Act. Moreover, Parents argue the court erred in failing to rule on their requests to "appoint" them as supported decision-makers and two others as successor supported decision-makers.

23

William challenges the court's decision regarding his voting capacity, arguing that, even though "[t]he Circuit Court correctly focused upon how the issue at trial was the [Act] and its place as a less restrictive alternative to guardianship[,]" it "erred by assessing [his] capacity to vote in forced isolation, without evaluating how the Parents could support him." In William's view, the Act "does not require judicial 'appointment' of a supported decision-maker[,]" but its ruling on his voting rights must be overturned for two reasons. First, he argues that the court "applied the wrong legal standard[s]" when it "added a[n] 'understand the voting process' test to enfranchisement not found in the Election Law, which only requires effective communication of a 'desire to participate in the voting process.'" Second, the court again erred "in a way directly connected to the [Act]," William continues, when it prohibited him and his Parents "from using (or demonstrating) the use of supported-decision-makers as an accommodation." Consequently, William contends that the circuit court's determination that he could not understand the voting process sufficiently to communicate his desire to participate "even with the help and guidance of supported decision-makers" is clearly erroneous because the court "affirmatively barred the Parents from engaging in, or in any way demonstrating their role, as an accommodation."

As the excerpted transcript shows, the circuit court and counsel recognized there is no precedent explaining how William's request to vote intersects with his right to receive decision-making support from his Parents. After expressing understandable uncertainty affecting both the applicable procedures and legal standards, the circuit court denied both William's right to vote and the joint requests for approval of Parents as supported decision-

24

makers. Addressing each ruling and rationale in turn, we conclude the court erred as a matter of law and explain why we are remanding for reconsideration of those requests.

### *Voting Disqualification*

As discussed, the legal standard governing judicial disqualification of William's right to register and vote is whether clear and convincing evidence establishes that he "cannot communicate, with or without accommodations, a desire to participate in the voting process[.]" EL § 3-102(b)(2). William testified affirmatively ("Yeah") when asked whether he wanted to vote in the election, considered voting in the election important, and thought he would be able to do that with help. When asked to name Republican and Democratic candidates for president, he answered, "Biden" and "Kamala Harris."

At that point, the judge interjected, asking "why is it important for you to want to vote? Can you tell me what's important to you when it comes to voting?" Although William did not respond to that question, after counsel for Parents resumed the examination, asking whether William talked about voting when he was home with his parents, he responded "Yeah." Next, he answered whether he "ever had a favorite president[,]" immediately stating, "Obama." William then responded affirmatively to follow-up questions about whether he thought "he did a good job as a president" and whether William "care[d] about who is the leader of the country."

The court again posed its own question, asking "what is the leader of the country called?" Counsel for Parents then requested permission to ask the question, rephrasing it to ask what he would call Obama and "[w]ho lives in the White House?" After William

25

answered "[t]he president" and affirmed that "[t]he president lives in the White House[,]" there were no more questions from the court, counsel for Parents, or counsel for William.

The court then expressed its "concern" that William lacked "a base knowledge . . . about the president," stating that "he has to have some base level [of] understanding of the political process, of why he's voting for a particular person, and I'm not getting that." Acknowledging that William "expressed a desire when [counsel] asked him" about voting, the court then observed that "when I asked him very basic questions, he's not able to respond."

Counsel for Parents objected that the court was creating an "additional burden, that's not within the statute[,]" which requires only that the court decide whether William can "express" a "desire" to vote. Although counsel maintained that William's knowledge of "current candidates," "the current president," a past president, and "who lives in the White House" . . . "represents about the base level knowledge of the average American citizen with respect to politics[,]" he pointed out that "[t]he question is not his knowledge base . . . or whether his parents talked to him, or whether they're lifelong democrats, or life long republicans[,]" but instead "simply" whether he can "express his desire to vote. And he's done so."

Nevertheless, the circuit court ruled that William had not "sufficiently expressed his desire on this issue[,]" because even though "he was responsive," he did not "independently sufficiently express[] the desire" to vote. Even after counsel persuaded the judge to revisit the issue, she expressed her doubts by comparing William to her neighbor, whom she described as "midway" on "the autism spectrum" and "could discuss with me some level

26

of politics" with only some "tweak[ing]" of the conversation for "her to understand some thing or to talk at a more fundamental level to make sure she understands before she . . . pulled that kind of lever." Stating "I wasn't even getting that from William[,]" the judge agreed that voting rights and supported decision-making statutes can co-exist, but ultimately concluded, "just not for William. I think he's not the one." The court subsequently entered an order denying William "the right to register to vote and to participate in the voting process[,]" stating that it found "by clear and convincing evidence that [he] lacks sufficient capacity to understand the voting process and/or to effectively communicate a desire to participate in the voting process, even with the help and guidance of supported decision-makers."

As written, Maryland's disqualification statute applies when an otherwise qualified individual "is under guardianship for mental disability and a court . . . has specifically found by clear and convincing evidence that the individual cannot communicate, with or without accommodations, a desire to participate in the voting process[.]" EL § 3-102(b)(2). To that requirement, the circuit court erroneously engrafted an additional test that required William to establish a "base understanding" of politics. As the excerpted transcript shows, the court repeatedly indicated that it was disqualifying William because he did not demonstrate a "base level understanding of the political process, of why he's voting for a particular person[.]" That is not the correct legal standard for determining whether William is disqualified from participating in the voting process.

Compounding that error in applying the wrong legal standard, the court also erred or abused its discretion in denying William any "accommodations" to assist him in

27

communicating his "desire to participate in the voting process[.]" *See* EL § 3-102(b)(2). For example, as William took the stand in the courtroom, in circumstances that commonly induce anxiety for any witness about to be questioned under oath, the court expressly prohibited Parents from offering any assistance, including help that might have avoided the correction made by the judge when William raised the wrong hand to take his oath. We also note that after counsel for Parents elicited William's affirmations that he wants to vote and talks about voting with Parents, William became unresponsive to the judge's compound questions about why he wanted to vote. Once counsel resumed questioning, William testified affirmatively when asked whether he cares about who is leading the country and, without prompting, identified specific candidates, his favorite former president, and where the president lives. Based on this record, we cannot say that the denial of any and all accommodations to assist William in understanding and responding to questions had no impact on his testimony or on the court's assessment of it.

We discern nothing in the Election Law statute that would preclude Parents from offering reasonable help to William as an accommodation contemplated by the disqualification statute. To the extent the court misunderstood the statute to preclude such assistance, the court erred as a matter of law. To the extent the court applied the statute in refusing such assistance, the court abused its discretion in these circumstances.

Because the court applied the incorrect legal standard and failed to permit reasonable accommodations to assist William in communicating his desire to vote, we must vacate the order denying William "the right to register to vote and to participate in the voting process[.]" We will remand for reconsideration of that disqualification question.

28

On remand, the court and counsel may consider any updated and additional information relevant to that determination.

### *Supported Decision-Making*

The circuit court interpreted Parents' petition requesting approval as supported decision-makers (and others as successor supporters) to be limited to voting rights. Based on the court's conclusion that William is not qualified to vote, and its concern about issuing a "carte blanche" approval of Parents as decision-making supporters, the court denied their request.

Although we found no case law interpreting or applying this new statute, its plain language and purpose contemplates judicial review of Parents' proposed SDMA because they are William's guardians. *See* E&T § 18-107(b)(8) (requiring SDMA to "[b]e approved by the court if the adult has been appointed a guardian of the person or property and the supported decision-making agreement affects the authority of the guardian"). To the extent the circuit court predicated its denial of Parents' petition on its determination that William is not qualified to participate in the voting process, its error in applying the wrong legal standard requires us to vacate the order denying that petition.

Although not raised as grounds for denying Parents' petition, either below or in this Court, we also recognize there was no clear proffer regarding the SDMA sought by Parents and William. Because "[a]n adult may utilize supported decision making to . . . [i]ncrease the adult's self-determination[,]" E&T § 18-103(a)(1), we affirm that adults under guardianship for mental disability may benefit from supported decision-making. But in this instance, Parents did not clearly state the scope and terms of the contemplated support

29

for William, leading to confusion over whether Parents were seeking authority outside the context of voting. *See generally* E&T § 18-107(b)(4)-(6) ("A supported decision-making agreement shall . . . [d]escribe the decision-making assistance that each supporter may provide[,]" "[d]escribe how the supporters may work together if there is more than one supporter[,]" and "[d]escribe how any perceived or actual conflict of interest between the supporter or supporters and the adult shall be mitigated[.]"). Nor did the parties satisfy the statutory requirements that SDMAs must be in writing, dated, signed, and witnessed. *See* E&T § 18-107(a) ("A supported decision-making agreement may be in any form consistent with the requirements under this section.").

Here, the lack of an SDMA proposal meeting these standards understandably hindered the court and counsel as they navigated the implementation of this new statutory tool. Upon remand for reconsideration of the voting rights issue, any new request for approval of Parents as supported decision-makers must comply with these statutory criteria.

**ORDER DATED AUGUST 24, 2023 (ENTERED AUGUST 28, 2023), DENYING PETITION TO MODIFY GUARDIANSHIP WITH RESPECT TO VOTING RIGHTS AND SUPPORTED DECISION-MAKING AGREEMENT, VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. PARTIES TO PAY THEIR OWN COSTS.**

30